SAN ANTONIO HISPANIC POLICE
OFFICERS' ORGANIZATION,
INC., et al., Plaintiffs,

v.

The CITY OF SAN ANTONIO,
et al., Defendants.

No. Civ.A. SA–94–CA–242–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

June 12, 1999.

· Jesse Roy Botello, Law Offices of Jesse R. Botello, San Antonio, TX, for plaintiffs.

Ruben Dario Campos, Wickliff & Hall, San Antonio, TX, for defendants.

Randolph P. Tower, Clemens & Spencer, P.C., San Antonio, TX, for San Antonio Police Officers' Association.

### ORDER APPROVING IN PART AND DISAPPROVING IN PART CLASS ACTION SETTLEMENT

BIERY, District Judge.

### PROLOGUE AND SYNOPSIS

The matter before the Court is about the promotion system of the San Antonio Police Department ("SAPD"). It arises out of conflict between and among diverse and strong personalities and groups within the department. Although filed in 1994 by the San Antonio Hispanic Officers' Organization, Inc. ("SAHPOO") alleging ethnic discrimination, the case has its antecedents in the past 150 years of South Texas history. *White v. Regester*, 412 U.S. 755, 767–68, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (history reveals Bexar County Mexican–American community and other Mexican–Americans in Texas have long "suffered from, and continue[ ] to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others").

The primary mission of San Antonio police officers is to protect and serve the citizens who employ them. To accomplish that purpose requires teamwork and cooperation which is not enhanced by the distraction and expense of officers suing officers. With this Court's encouragement, well qualified counsel and the leadership of SAHPOO, the City of San Antonio and the San Antonio Police Officers' Association ("SAPOA") have advocated and negotiated in good faith a proposed diplomatic resolution of the controversy in lieu of more years of courtroom battle and the peripheral effect on the noncombatant local taxpayers who pay the bills. As is the

case most often, the proposal is not presented in unanimous harmony, but the alternative to compromise probably would be the demise of policing effectiveness.

The dilemma for this Court, and the appellate courts if any party appeals, is the confluence of two competing statutory systems, both of which are intended to level the playing field for those who have not always enjoyed equal rights in the workplace. The Civil Rights Act of 1964, as amended in 1991, was fashioned to provide a remedy to those who allege and prove employment discrimination because of national origin or whose allegations and evidence support a settlement. 42 U.S.C. §§ 2000e to 2000e–17. Similarly, the labor laws are designed to give a meaningful place at the bargaining table to groups of employees who need collective strength to balance more evenly the economic power of employers. Labor Management Relations (Taft–Hartley) Act, 29 U.S.C. §§ 141 to 197; Tex.Rev.Civ.Stat.Ann. art. 5154c–1 § 5(a) (Vernon 1987). When these statutory goals collide, the practical result becomes working people at odds with other working people. Guess who loses?

The proposal for changing the promotion process for detectives, sergeants, lieutenants and captains can be divided into two main categories. The first relates to elimination of the "assessment center," which consists of an objective written examination and a subjective interview evaluation. The subjective criteria of the assessment center is perceived by plaintiffs to be discriminatory in practice.[1] There are allegations some officers were given more time to study and even promoted because of internal politics, their relationships with supervisors and those who conducted the interviews. The suggested alternative would seek to eliminate the subjectivity of the assessment center by replacing it with an objective examination based on video presentations of policing situations requiring management decision-making skills. The Court finds the proposed change in the

---

1. A "whose ox is being gored" example is that of one of the named plaintiffs who, upon being promoted to higher rank, apparently decided the present system was not so bad after all and subsequently withdrew as a plaintiff.

promotion testing scheme goes to the heart of plaintiffs' allegations.

The second category would add an objective point system. A candidate for promotion would be eligible to receive points for bilingual ability and educational attainment. A point would be deducted for officers suspended more than thirty days. Already a part of the collective bargaining agreement, the proposed consent decree also incorporates seniority points for time in service with the police department. Time in rank seniority points have also been added under the terms of the proposed consent decree. Though some believe the proposed point scoring ideas have merit, the question for the courts is whether this part of the proposal has a sufficient nexus to the lawsuit to justify circumventing the collective bargaining process.

After living through five years of hearings, conference calls, status conferences and wading through approximately 2,000 pages of pleadings, briefs, and documents, it is the Court's judgment the time has come for San Antonio police officers to focus on their law enforcement responsibilities to the citizens of San Antonio and to be free from the discord of this litigation. Therefore, the settlement is approved except for these items which the Court finds to be addressed more appropriately at the collective bargaining table:

- a promotional point for bilingual ability;
- promotional points for educational attainment;
- a deduction of a point for suspension of more than thirty days;
- seniority points for time in service and time in rank.

There is authority indicating a proposed class action settlement must be either totally approved or completely rejected without modification. *Evans v. Jeff D.*, 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). If any of the parties wish to appeal, they may certainly invoke *Evans* in order to continue draining the taxpayers' pool of money. On the other hand, the parties may elect not to appeal. They may choose to address other issues through the SAPOA political process and collective bargaining. *See Dutmer v. City of San Antonio*, 937 F.Supp. 587 (W.D.Tex.1996) (District court held city council term limit constitutional, albeit trial judge believed it to be ill-advised policy. Neither party appealed and citizens are now discussing whether term limits should be modified through revision of the city charter.[2] This is called democracy.).

Notwithstanding *Evans*, the people through their elected representatives subsequently passed the Civil Justice Reform Act ("CJRA") of 1990, the intent of which is to seek expeditious and less expensive ways to end disputes. 28 U.S.C. §§ 471 to 482. Moreover, the case of *United States v. City of Miami*, 664 F.2d 435, 448 (5th Cir.1981), offers an example of a court approving only a part of a proposed class action settlement. Common sense supports the idea of doing in the district court sooner and less expensively what could be done in the appellate court later and more expensively. Rather than a hypertechnical approach which would no doubt continue the litigation at public expense, this Court chooses to implement the spirit of the CJRA and to follow the example of *City of Miami* in approving all of the agreement but for the portions set forth above.[3]

## OVERVIEW

This case was initiated on January 13, 1994, by SAHPOO and individual officers against the SAPD,[4] the City of San Antonio, the then-mayor, individual council members, the city manager and the chief of police alleging violations of Title VII, 42 U.S.C.

---

**2.** *See* Bruce Davidson, *Term Limit Vote Delay is Likely*, SAN ANTONIO EXPRESS NEWS, July 8, 1999, at 5B.

**3.** On remand, a consent judgment was entered into between the United States, the City of Miami and the union. *See United States of America v. City of Miami*, Civil Action No. 75 3096 Civ JWK, 1983 WL 532, at *1 (S.D.Fla. June 1, 1983) (referencing unpublished consent order issued April 4, 1983). From this, the Court infers the parties modified the proposed consent decree as suggested by the Fifth Circuit.

**4.** The SAPD is not a separate legal entity capable of being sued in its own right.

§§ 2000e to 2000e–17. The original complaint alleged racial and national origin discrimination and retaliation against Hispanic police officers based on a pattern and practice of discrimination with respect to the terms and conditions of their employment. The SAPOA was allowed to intervene a short time after the case was filed.

The parties and counsel have engaged in thousands of hours of legal work, investigation, analysis and mediation. Resulting from this effort is a proposed consent decree.[5] Plaintiffs and defendants request final approval of a settlement agreement pertaining to a settlement class consisting of:

> all "Plaintiffs," "SAHPOO," all past and present Hispanic officers, and all past and present applicants for sworn positions with "SAPD" who were in any manner allegedly discriminated against on the basis of their national origin (Hispanic) within the meaning of Title VII and/or retaliated against within the meaning of Title VII.

The intervenor and individual officers object to entry of the proposed decree. The majority of objections are leveled against the proposed point system. Objections are also made that this lawsuit should not be settled at all, or should be settled pursuant to the collective bargaining process. "The Collective Bargaining Agreement by and Between the City of San Antonio, Texas, and The San Antonio Police Officers' Association" (sometimes referred to as the "CBA") covers compensation and working conditions for police officers of the city. This document provides for seniority to be achieved solely through time in service.

### SETTLEMENT AND FAIRNESS HEARING

Plaintiffs and defendants through counsel represented to the Court their unanimous opinion the settlement agreement is fair, adequate and reasonable. Intervenor SAPOA originally agreed to the settlement, but later challenged entry of the decree based upon the inclusion of the proposed point system. On December 16, 1998, a fairness hearing was scheduled and the form of notice was approved by order of this Court. The Court also preliminarily certified the class pursuant to rules 23(a), (b)(2) and (e) of the Federal Rules of Civil Procedure solely for the purpose of settlement. The fairness hearing was conducted on March 5, 1999.

### ELIMINATION OF THE ASSESSMENT CENTER AND THE ADDITION OF THE POINT SYSTEM

In the 1994 complaint, Hispanic officers alleged the department's two-step promotion process discriminated against them. Plaintiffs maintained even when Hispanic officers scored high on step one—a written examination—they were often eliminated by the assessment center, a group of nondepartmental officers who conducted oral and subjective examinations. Plaintiffs alleged Hispanic officers are three times as likely as other officers to be denied promotions after being evaluated by the assessment center. On March 4, 1997, this Court issued a preliminary injunction precluding use of the assessment center for the purpose of promotions. None of the parties have asked to reinstate the assessment center.

The proposed consent decree eliminates the assessment center, but candidates for promotion continue to take a written exam worth 100 points. The assessment center is replaced with an exam based on a video presentation, also worth 100 points. As discussed in the Prologue and Synopsis, a candidate is also eligible to receive ten possible points for time in the police department (one point for each year of service, ten point maximum); five possible points for time in rank (one point for each year in rank of sergeant and/or lieutenant, five point maximum); one possible point for language proficiency other than English, including sign language; one possible point for a bachelor's degree; and one possible point for a master's degree. A candidate may also have one point deducted for disciplinary proceedings resulting in the officer's suspension for more than thirty days.

### JURISDICTION/CERTIFICATION OF CLASS

#### JURISDICTION

Plaintiffs' complaint alleges violations of Title VII of the Civil Rights Act. 42 U.S.C.

---

**5.** The proposed consent decree is attached in its entirety as "Exhibit A" to this opinion.

§§ 2000e to 2000e–17. The Court has jurisdiction over this case and over the class. 28 U.S.C. § 1331.

## CLASS CERTIFICATION

Plaintiffs seek to settle this action on behalf of themselves and as a class action on behalf of those similarly situated alleging defendants discriminated and retaliated against Hispanic police officers in violation of Title VII of the Civil Rights Act. 42 U.S.C. §§ 2000e to 2000e–17. Class actions are governed by rule 23 of the Federal Rules of Civil Procedure. The four threshold requirements of rule 23(a) are:

- Numerosity: a "class [so large] that joinder of all members is impracticable";

- Commonality: "questions of law or fact common to the class";

- Typicality: named parties' claims or defenses "are typical ... of the class"; and

- Adequacy of Representation: representatives ."will fairly and adequately protect the interest of the class."

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). In addition to satisfying the above requirements, the "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* Here, the parties are seeking certification pursuant to rule 23(b)(2) which "permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.' " *Id.* A prime example of a rule 23(b)(2) class is a civil rights case "against parties charged with unlawful, class-based discrimination" such as this. *Id.*

■■■ The parties have agreed to class certification for settlement purposes only. Despite the conditional class certification of December 16, 1998, one circuit has held "courts employing settlement classes must still make findings that the class complies with Rule 23(a) and the appropriate parts of Rule 23(b)" and the failure to so do is "a plain error of law and hence an abuse of discretion requiring the certification be set

aside." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). The Supreme Court has reviewed this issue and modified the Third Circuit's interpretation that each requirement under rule 23(a), and in that case 23(b)(3), "must be satisfied without taking into account the settlement" to "settlement is relevant to a class certification." *Amchem Prods., Inc.*, 521 U.S. 591, 117 S.Ct. at 2248. In light of the *Amchem Prods., Inc.* decision, the Supreme Court vacated the judgment and remanded for reconsideration a class action settlement affirmed by the Fifth Circuit Court of Appeals. *Flanagan v. Ahearn*, 521 U.S. 1114, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997). After oral argument and reconsideration, the Fifth Circuit found nothing in the *Amchem* opinion changed its prior decision. The prior decision was affirmed. *In re Asbestos Litig.*, 134 F.3d 668, 669 (5th Cir.1998). In its prior opinion, the Fifth Circuit provided this insight concerning whether a court should consider settlement in determining if the prerequisites of rule 23 are satisfied:

The rule that a court should consider a proposed settlement, if one is before it, when deciding certification issues makes good sense. Settlements and the events leading up to them add a great deal of information to the court's inquiry and will often expose diverging interests or common issues that were not evident or clear from the complaint. (citation omitted).

We are bound to follow Container I's [*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir.), *aff'd*, 659 F.2d 1332 (5th Cir.1981), *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982)] holding that the district court can and should look at the terms of a settlement in front of it as part of its certification inquiry. We would adopt this rule even if we were not bound by precedent because it enhances the ability of district courts to make informed certification decisions.

*In re Asbestos Litig.*, 90 F.3d 963, 975 (5th Cir.1996), *cert. granted, judgment vacated by* 521 U.S. 1114, 117 S.Ct. 2503, 138 L.Ed.2d 1008, *aff'd*, 134 F.3d 668 (5th Cir.1998), *rev'd*

on other grounds, —— U.S. ——, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Applying these principles, the Court will examine the class action prerequisites.

### Rule 23(a) Prerequisites

■ In deciding whether to certify a class, a district court is given wide discretion. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471–72 (5th Cir.1986). "A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 523 (E.D.Tex.1995). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representatives parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a).

### Numerosity

■ As set forth in rule 23(a)(1), the numerosity prerequisite is met when "joinder of all members is impracticable." To meet this requirement, the exact number of potential members need not be established nor do the members of the class need to be identified individually. *Celestine v. Citgo Petroleum Corp.*, 165 F.R.D. 463, 466 (W.D.La. 1995), *aff'd*, 151 F.3d 402 (5th Cir.1998). Other factors in addition to the actual or estimated number of potential class members relevant to the numerosity element include, for example, "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981). The proper focus is not solely on the number of members but "on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Id.* (quoting

*Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir.1981)). Moreover, in certifying a class seeking only injunctive relief, the numerosity requirement may be fulfilled even when the class is small because the benefits to be gained not only inure to the benefit of the known class but will benefit a future class of indeterminate size. *Young v. Pierce*, 544 F.Supp. 1010, 1028 (E.D.Tex. 1982). These unknown future members should be properly considered and included as a part of the class and "joinder of such persons is inherently impracticable." *Id.* at 1028–29.

■ Plaintiffs and defendants ask this court to certify a class seeking injunctive and declaratory relief on behalf of all past and present Hispanic SAPD officers and all past and present applicants for sworn positions with the department who were allegedly discriminated or retaliated against by the department. Many Hispanic individuals are past or present SAPD officers and a large number of Hispanic individuals have submitted applications for sworn positions with the department. However, not every past or present Hispanic officer and applicant alleges discrimination and/or retaliation. Nonetheless, these officers and applicants, and untold number of prospective officers and applicants, may benefit from the settlement in the future. Accordingly, the Court concludes the joinder of all parties is indeed impracticable. The numerosity requirement is met.

### Commonality

■ The commonality requirement of rule 23(a) requires there be at least one factual or legal issue which is common to all or substantially all of the class members. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). The "commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993). "The threshold of 'commonality' is not high." *Jenkins*, 782 F.2d at 472. As long as class members are allegedly affected by a defendant's general policy, and the general policy is the crux or focus of the litigation, the commonality pre-

requisite is satisfied. *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 158 (S.D.Ohio 1992), *appeal dism'd without opinion*, 995 F.2d 1066 (6th Cir.1993). Plaintiffs allege defendants discriminated and retaliated against them because of their national origin or race, Hispanic, in violation of Title VII, through policies, practices and procedures implemented by the police department. 42 U.S.C. §§ 2000e to 2000e–17. This conduct impacts all class members and constitutes a barrier towards the entire class. Given the class members are affected by the general policy, and that policy is the focus of this litigation, the Court finds the commonality requirement has been satisfied. *See* 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 (1986) (class actions seeking injunctive or declaratory relief often by their very nature present common questions fulfilling commonality requirement except when propriety of relief "turns on a consideration of the individual circumstances of each class member or the defendant has not engaged in a common course of conduct toward them").

## Typicality

▉ The typicality requirement does not focus as much on the relative strengths of the cases of the named and unnamed plaintiffs as it does on the "similarity of the legal and remedial theories behind their claims." *Jenkins*, 782 F.2d at 472. The prerequisite in the settlement context requires "proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 524 (E.D.Tex.1995)(quoting 2 NEWBERG ON CLASS ACTIONS § 11.28, at 11–58). In fulfilling this element, plaintiffs or class representatives must possess "the same interests and suffer the same injuries as the proposed class." *Celestine v. Citgo Petroleum Corp.*, 165 F.R.D. 463, 467 (W.D.La.1995), *aff'd*, 151 F.3d 402 (5th Cir.1998). This requirement like the commonality requirement is not demanding. *Id.*

▉ Plaintiffs here do not assert claims unique to themselves. Instead, plaintiffs as class representatives have been allegedly adversely affected by the same policies, practices and procedures as the absent class members. The named plaintiffs are individuals of Hispanic origin who arguably have been discriminated and retaliated against on the basis of race by defendants. These plaintiffs assert that, in the same general manner as all other class members, defendants have allegedly failed to modify their policies, practices and procedures to avoid discrimination and retaliation. Because this case involves a challenge to those policies, practices and procedures which are said to have been discriminatory and retaliatory, rather than a redetermination of each class member's individual claim, any factual difference concerning the specific manner in which different class members may have been injured is of no consequence. Each member of the class contends loss as a result of defendants' alleged discrimination and/or retaliation and each class member has the same interest in pursuing this settlement with the end result being a change or modification of the challenged practices, policies and procedures. Accordingly, the typicality standard has been met.

## Adequacy of Representation

▉ Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." To meet this requirement, two elements must be satisfied: (1) concerns regarding the qualifications of counsel and (2) concerns regarding "the relationship between the interests of the class representatives and the interests of other class members." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 524 (E.D.Tex.1995) (quoting *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 273 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986)). The Court must be sure there is an absence of conflict and be assured of a vigorous prosecution. 1 NEWBERG ON CLASS ACTIONS § 3.22, at 3–126.

## Qualifications of Counsel

▉ Plaintiffs' counsel, Jesse Botello, is a practitioner who has advocated and defended the rights of minority groups in many cases

involving discrimination and retaliation based on national origin and race. The Court had the opportunity to see counsel in action and review the pleadings and other legal memoranda submitted by counsel during the pendency of this case. Mr. Botello has not only appeared before the Court in this case, but has appeared in other matters. Mr. Botello performed hundreds of hours of work, not only in the courtroom and through legal research and writing, but through meeting with the parties and individual officers in an effort to resolve this matter short of trial. Counsel also represented to the Court he believes his resources are more than adequate to represent the class competently and he has no other professional commitments which are antagonistic to, or which would detract from, his efforts to secure a favorable decision for the class herein. The Court is confident counsel provides adequate representation for the class.

### Class Representatives

■■■ The second element concerning adequacy of representation concerns the "representatives" of the class members. This element is satisfied if the class members' "interests are sufficiently aligned with those of other class members." *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 273 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986). The Court finds the named plaintiffs satisfy the requirement and adequately represent the class. All of the named plaintiffs are Hispanic and have availed themselves of the department's policies, practices and procedures. As set out in *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 525 (E.D.Tex.1995), "[c]lass representatives satisfy the adequacy requirement unless they have 'an insufficient stake in the outcome or interest antagonistic to the unnamed members.'" Moreover, as long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.), *aff'd following remand*, 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73

L.Ed.2d 1309 (1982). The Court cannot find any antagonistic interests between class members and unnamed members. Plaintiffs, through counsel, sought to obtain the best possible recovery for all members. Thus, the class representatives have met the primary standard for determining the adequacy of their representation. *See Gonzales v. Cassidy*, 474 F.2d 67, 75 (5th Cir.1973) (when class representative, though counsel, vigorously and tenaciously protects interests of class, primary standard for determining adequacy of class representative met).

### The Applicable Provision of Rule 23(b)

As previously noted, in addition to complying with the prerequisites of rule 23(a), a putative class action must also satisfy at last one subsection of rule 23(b). These parties seek certification under rule 23(b)(2) requiring the Court to find:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

FED.R.CIV.P. 23(b)(2).

■■■ The requirement of 23(b)(2) is almost automatically fulfilled in actions where the relief sought is primarily injunctive. *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir.1994). However, if the appropriate final relief relates solely or chiefly to money damages, a class may not be maintained under this subpart. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 450 (N.D.Cal.1994). A class of cases found to fall squarely within the category authorized by subpart (b)(2) are civil rights cases which seek "broad declaratory or injunctive relief for a large and amorphous class." *Jeanine B. ex rel. Blondis v. Thompson*, 877 F.Supp. 1268, 1288 (E.D.Wis.1995), *modified*, 967 F.Supp. 1104 (E.D.Wis.1997); *see Arnold*, 158 F.R.D. at 452 (Federal Rules Advisory Committee in drafting subpart (b)(2) of rule 23 "cited civil rights cases as the chief category of action for which the (b)(2) category was created").

It has been said the hallmark of a rule 23(b)(2) class action is homogeneity. *Arnold*, 158 F.R.D. at 451. It is because of this homogeneity courts are allowed to "dispense with notice to the class and bind all members to any judgment on the merits without an opportunity to opt out." *Id.* In addition to homogeneity, some courts identify the cohesiveness of the class as well as the homogeneity of the members' interests as the salient factors to consider. *Id.* at 451–52. The use of these factors was explained:

> Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a(b)(2) class are generally bound together through "preexisting or continuing legal relationships" or by some significant common trait such as race or gender. Although the interests of different members of a(b)(2) class are by no means identical the substantial cohesion of those interests makes it likely that representative members can adequately represent the interests of absent members and that the need for and interest in individual representatives will be minimal.

*Id.* at 452.

Plaintiffs brought this suit seeking only injunctive and declaratory relief for themselves and now seek such relief for those similarly situated who serve or have applied to serve the citizenry of San Antonio through its police department. In their complaint, plaintiffs maintain defendants failed to eliminate or modify policies, practices and procedures which discriminate and retaliate against plaintiffs and members of the class because of their Hispanic national origin. The class members are not challenging individual actions taken by defendants against each member individually but are challenging the actions as a whole. The claims of this class are homogenous and cohesive, and the present action is appropriate for class certification pursuant to rule 23(b)(2). *See Thrope v. Ohio*, 173 F.R.D. 483 (S.D.Ohio 1997). Accordingly, the Court concludes the class is properly certified.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 13, 1994, Captain Alex Torres, Lieutenant Manuel Longoria, Lieutenant Raymond Ybarbo, Sergeant Robert Garcia, Sergeant Richard Garcia, Patrolwoman Linda Diaz, and the SAHPOO, Lieutenant Raymond Ybarbo, President, filed suit against the City of San Antonio Police Department; Nelson W. Wolff, Mayor; Roger Perez, Ruth Jones McLendon, Linda Billa Burke, Henry Avila, Juan Solis III, Helen Ayala, William E. Thronton, Lyle Larson, Bob Ross and Howard Peak, City Council Members; and Alexander E. Briseño, City Manager and William Gibson, Chief of Police. Suit was filed in federal court in the Western District of Texas, Midland Division, and assigned to the docket of the Honorable ·Lucius D. Bunton III, Senior United States District Judge. Plaintiffs alleged the policies, practices and procedures implemented by the SAPD discriminated and retaliated against plaintiffs in violation of Title VII. Plaintiffs claimed discrimination and retaliation:

> based on a pattern of discrimination against Hispanics, resulting in a hostile work atmosphere, failure to promote, disparate disciplinary procedures and practices, under and over supervision and language duties, performance appraisals, recruitment, assignments, training, hiring, undercover assignments, overtime, geographic assignments, and interference in the performance of an officer's duties by allowing racial and ethnic stereotypes to exist as a way of doing business.

Defendants filed a motion to dismiss and answer on February 15, 1994. Plaintiffs requested, and were granted on February 25, 1994, a temporary restraining order (or "TRO") enjoining defendants from filling vacant deputy chief positions for an indefinite period of time. The order noted no Hispanic SAPD officer held the position of deputy chief at that time.

A preliminary injunction hearing was held on March 7, 1994, and the Court took the matter under advisement. On March 8th, Judge Bunton ordered the TRO would remain in full force and effect. Defendants filed a motion to dismiss which was denied and a scheduling order was entered.

On March 18, 1994, Judge Bunton granted a motion to transfer venue filed by defendants. The case was transferred to the San Antonio division and assigned to the docket of the undersigned.

On March 22, 1994, plaintiffs reurged their request for a preliminary injunction enjoining defendants from filling the deputy chief vacancies. Defendants filed an advisory stating they opposed the granting of a preliminary injunction because two individuals of Hispanic origin had been selected to fill the three vacant deputy chief positions. On March 23, 1994, Lieutenant Jerry Pittman, an African–American, moved to intervene and requested a TRO be entered on his behalf for the limited purpose of extending the deadline regarding the existing promotional eligibility list for the classification of captain. He stated "unless modified [the TRO entered by Judge Bunton would] allow for the expiration of a promotional eligibility list for the classification of a captain in the San Antonio Police Department on which Intervenor would have otherwise been promoted by contract and by operation of law." The Court granted leave to intervene and entered a temporary restraining order in Lieutenant Pittman's favor. The Court found the officer "would suffer immediate and irreparable injury, loss or damage if the existing eligibility list for the promotion to the classified rank of captain was allowed to expire because of the restraint imposed on defendants from appointing deputy chiefs in the department."

Also on March 23, 1994, the Court held an initial pretrial status conference and referred the case to mediation. Plaintiffs advised they filed a motion for class certification, which the Court took under advisement. SAPOA counsel advised he anticipated filing a motion to intervene on behalf of the union. The Court voiced concern about the impact protracted litigation would have on certain long term issues including:

- The public safety of the citizens of San Antonio;
- The adverse effects of internal dissension and protracted litigation within the San Antonio Police Department on discharging its duty to protect the citizens of San Antonio;
- The adverse effects on the morale of San Antonio police officers if there is a widespread perception within the department of unfairness in promotion and work assignment procedures;
- The need of the head of any organization to have some flexibility and discretion, within the rule of law, in filling top management positions; and
- The inability and inappropriateness of the Court micromanaging the SAPD.

San Antonio police personnel Ron Torres, Alan Lankford, Carlos Madero, Roy Thomas, Hilario Peña, James O. Self, Jesse Peña, Robert Hartle and Billy Smith were appointed to constitute the mediation panel. Former San Antonio police officers Emilio Cavazos, Dale Jacobs and Eddie Bourque were invited to attend and participate. Former Mayor Lila Cockrell; Richard Peña, Esquire; Robert Arellano, Esquire; former council member Joe Alderete, Jr.; and Robert Golden, Esquire, responded affirmatively to the Court's request they volunteer their time without compensation. Each served by presiding over and assisting the mediation panel.

On March 25, 1994, the Court issued an "Order re Deputy Chief and Captain Positions Within the San Antonio Police Department" stressing the need of the SAPD to be at full strength in the positions of deputy chief and captain, and any subsequent vacancies in lower ranks created by promotions to deputy chief and/or captain. The Court stated it was "not the intent of the order to address the underlying claims for damages and other relief and defenses to those claims." Noting the two temporary restraining orders in place seeking to maintain the status quo of promotions and prevent the expiration of eligibility lists, the Court balanced and considered the following factors when determining that position vacancies should be filled:

1. The mission of the San Antonio Police Department is to protect the citizens of San Antonio. In order to fulfill that mission, it is important that management positions within the department be filled, that subsequent positions

within the ranks occur and that morale within the department could be adversely affected if leadership positions remain vacant during what may be lengthy litigation;

2. Under the collective bargaining agreement between the City of San Antonio and the SAPOA, which impacts the preliminary issue of filling or not filling the deputy chief positions, the deputy chiefs are "at will" positions, and, therefore, are always subject to change and transfer by whomever is the current chief of police;

3. The individuals who have been tested and evaluated under current procedures will be detrimentally affected by the expiration on March 25, 1994, of the promotion eligibility lists as mandated by Texas statutes;

4. This Court should interfere in the day to day management of an organization only after a clear showing of actions within the organization which violate federal law or constitutional principles;

5. The temporary relief sought is requested under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e to 2000e–17, which prohibits discrimination in promoting based on, among other things, national origin;

6. There are six management positions within the SAPD which remain vacant as a result of the temporary restraining order(s) presently in place: three deputy chief positions and three captain positions. It has been represented to the Court that the vacating of the temporary restraining order(s) will result in the following promotions: To be promoted to deputy chief: Captain Gilbert Sandoval, Captain Al Philipus and Captain Albert Ortiz; to be promoted to captain: Lieutenant Jerry Pittman, Lieutenant Manuel Longoria and Lieutenant Rudy Vernon.

The Court found four of the six individuals proposed for promotion were within a protected class under Title VII of the Civil Rights Act. Based on the balancing of these factors, the evidence and the arguments of counsel, the Court ordered the temporary restraining orders vacated. The department made the promotions and Captain Pittman was later dismissed as intervenor by order of the Court.

On March 28, 1994, SAPOA filed its motion to intervene which was granted by the Court on April 1, 1994. SAPOA was not aligned with defendants, nor was it aligned with plaintiffs. Rather, the union was given separate-party status on all issues.

Those involved in the mediation conducted preliminary meetings to discuss issues and procedures relating to the upcoming session. The mediation was held on April 30, 1994. Although the parties were able to work out some of their disputes, no settlement was reached.

A revised scheduling order was entered. The parties engaged in some discovery, which resulted in plaintiffs filing a motion for protective order. Additional time was sought to mediate the issue of what modifications and improvements, if any, should be made to the SAPD promotion process. The Court allowed the parties additional time to attempt to resolve their differences.

On June 12, 1995, the parties filed a joint motion requesting the scheduling order be held in abeyance as the parties were close to reaching a final settlement of the case. The parties advised defendants were in the process of drafting a proposed consent decree. The motion was granted and, in anticipation of concluding this matter, a status conference was scheduled to discuss the progress of the settlement negotiations. At the hearing, the parties advised the Court that although agreement had not been reached on all outstanding issues, significant progress had been made. It appearing a settlement was imminent, the Court issued an order denying pending motions, including plaintiffs' motion for class certification, without prejudice to refiling in the event the case failed to settle.

In April of 1996, the Court asked to be informed as to the status of the case. The parties stated they still believed a tentative agreement had been reached on the vast majority of substantive issues pending. The Court stated the case would again be re-

ferred to mediation unless the parties and counsel reached a settlement between themselves before June 28, 1996. The Honorable John Yates and Renè Barrientos, Esquire, were named mediators. Judge Yates is a senior district judge and former assistant and first assistant with the Bexar County District Attorney's Office. Mr. Barrientos is a former Dallas police officer and presently a civil trial attorney with experience representing both plaintiffs and defendants. Although the June 28th deadline passed without resolution of the case, the Court continued to allow the parties to mediate between themselves based upon oral representations a settlement was close at hand.

The Court again requested to be informed in writing of the status of the case in September of 1996. Plaintiffs conceded discussions had proceeded at a "slow pace," but stated "the myriad of intricacies involved in attempting to fashion meaningful relief by way of a Consent Decree are formidable." Plaintiffs also advised progress had been hampered by the illness of the new chief of police, Al Philippus, "an invaluable presence at almost all negotiating sessions." Defendants advised they sincerely believed the parties were close to a settlement, although the "thorny" key issue of modifications to the promotion process was still being negotiated. The union agreed. The Court determined negotiations should proceed and continued to monitor the case.

In November of 1996, intervenor announced a change in counsel had become necessary.[6] On November 22, 1996, an order was entered excusing SAPOA from formally participating in settlement discussions for sixty days until new counsel could be obtained and briefed on pending matters. New counsel filed a notice of appearance on December 12, 1996.

Upon review of oral status reports and the record, a status conference with all counsel was held on February 13, 1997. Counsel reported they were optimistic the case would settle, but a few items still remained in dispute.

One week later, plaintiffs filed a motion for temporary restraining order and preliminary injunction seeking to enjoin the department from using the assessment center in the promotion process. Plaintiffs alleged they scored higher on their written promotion examination than other officers, but:

> [a]fter undergoing the Assessment Center phase of the promotion eligibility which was tainted, biased and conducted illegally, the plaintiffs' ranking dropped substantially, such that their likelihood of promotion was adversely affected if not put completely out of reach.

A hearing was held on February 24, 1997. Defendants and intervenor acknowledged the assessment center had its problems and may need to be modified or eliminated completely. On March 4, 1997, this Court issued a preliminary injunction precluding use of the assessment center for the purpose of promotions:

> the City of San Antonio and the San Antonio Police Officers' Association, their officers, agents, servants, employees and attorneys, are hereby preliminarily enjoined until further orders from this Court from again conducting any new assessment centers for the purpose of promotions within the San Antonio Police Department....

A second matter was taken up at the February 24th hearing. Plaintiffs' application for injunctive relief also sought protection of those historically denied promotions because of their national origin or gender. In response to plaintiffs' motion, SAPD officers Kimberly Pastol, Wayne Swindell, Tracy Powers, Irene Spiess and Victor Almaraz were granted leave to intervene as defendants to argue recent promotions had been made without the taint of discrimination. Noting the record reflected that of the fifteen people to be promoted, nine were Hispanic and/or female, this request for protective relief was denied.

In May of 1997, the Court again asked to be informed of the status of the case. The parties advised the remaining unresolved issues dealt in large part with the promotion

---

**6.** Some of the delays in bringing this matter to closure can be attributed to several changes in attorneys for the parties, city council elections, elections of new officers for the SAPOA and the SAHPOO and leadership changes within the police department.

process, but the litigants were confident a proposed consent decree could be submitted to the Court in early July, 1997. Plaintiffs' advisory also indicated the intervening union was taking the position it should submit the decree to a vote of its general membership before submission to the Court. Plaintiffs opposed such a vote. SAPOA filed this letter response:

> [C]ounsel for plaintiffs suggests that the current Collective Bargaining Agreement between SAPOA and the city, at Article XXXVII, Section 4, allows the Executive Board of SAPOA to approve the language of any proposed Consent Decree for submission to the Court. However, a review of the language of that section points out that the Consent Decree will be implemented as an amendment to the Collective Bargaining Agreement. Any proposed amendment to the Collective Bargaining Agreement would be submitted to the [SAPOA] membership for approval before its enactment. The Association simply seeks to utilize the normal procedure for approving an amendment to the Collective Bargaining Agreement which allows its membership the opportunity to approve or disapprove the proposed amendment.

The Court ordered the parties to file briefing on this issue.

The parties submitted drafts of their agreement to the Court beginning in May, and a finalized proposed consent decree was marked "Received" by the district clerk on July 2, 1998. After considering the arguments of counsel both in favor and against submitting the decree to a vote of intervenor's general membership, the Court issued an advisory stating SAPOA officers would be allowed to vote and also voice their opinions on whether the decree should be approved or disapproved at a fairness hearing:

> Although the Court recognizes no compromise agreement will attain perfection by pleasing all interested individuals, the Court has been apprised the leaders of the San Antonio Police Officers' Association, the Hispanic Police Officers' Organization and the City of San Antonio have agreed to the settlement.... Inasmuch as the proposed consent decree changes certain portions of the Collective Bargaining Agreement, members of the San Antonio Police Officers' Association shall be given the opportunity to review the consent decree. Those who are in favor of the consent decree need do nothing to express their approval. San Antonio Police Officers' Association members opposed shall have the opportunity to express their opposition by casting a negative vote in a special election to be conducted by the San Antonio Police Officers' Association, and, if they wish, to voice any objections at the fairness hearing to be conducted by the Court pursuant to Federal Rule of Civil Procedure 23(e).

SAPOA's executive board unanimously approved the proposal and recommended it be supported by SAPOA members. Nevertheless, of the 1,869 SAPOA members, 565 voted in opposition to entry of the decree. A second vote was taken to determine levels of support and opposition, including reasons for opposition. The result of the second election showed the level of opposition to the proposed consent decree remained almost constant from the first to the second election at approximately one-third of the SAPOA membership. Less than five percent of the membership voted in support of the proposed decree, and almost two-thirds of the membership did not cast a vote. Of the one-third of the SAPOA membership who continued to be opposed to the proposed consent decree, eight percent opposed the decree in its entirety. The rest opposed that part of the decree which included an award or deduction of promotional points based upon language, education and/or disciplinary proceedings.

In an effort to ascertain the level of objection among certain key persons in this litigation, the Court required the chief of police and the deputy chiefs, captains, and lieutenants, along with the SAHPOO board and the SAPOA directors and board, to voice their opinions regarding the proposed consent decree. The rank and file officers were invited, but not required, to state their support or opposition to the decree. As of the end of December, 1998, the Court's "Declaration Pursuant to 28 U.S.C. § 1746" was returned

by over 500 officers.[7] Forty out of fifty members of the group which included the chief, deputy chiefs, captains and lieutenants opposed the settlement; one out of five members of the SAHPOO board opposed entry of the decree; twenty-one out of twenty-eight members of the SAPOA voiced their opposition to the agreement. Of the 502 rank and file officers who responded to the Court's questionnaire, 120 were in favor of the proposed consent decree, while 382 were opposed to its entry. As with the other votes, the vast majority of objectors opposed the proposed point system.

On September 11, 1998, the Court conducted a status conference and orally granted plaintiffs' motion to schedule a fairness hearing. The parties, including the SAPOA, submitted suggested forms of notice to class members. The Court issued a draft notice, which was agreed upon by counsel. On December 16, 1998, the form of notice was approved by order of this Court, and the Court also set a hearing date on the proposed settlement and conditionally certified the class pursuant to rules 23(a), (b)(2) and (e) of the Federal Rules of Civil Procedure solely for the purpose of settlement.

On January 20, 1999, plaintiffs filed a "Motion for Order Concerning Promotions to Lieutenant and Captain" requesting the Court to implement the consent decree due to upcoming vacant positions at the ranks of lieutenant and captain. The request was denied by order dated January 26, 1999. The Court delegated the power to make decisions regarding promotions to the chief of police, working with his deputy chiefs, until such time as the fairness hearing was held and it was determined whether the proposed consent decree was fair, adequate and reasonable.

This internal police department litigation has its beginnings in the allegation that the previously preferred promotion process was fraught with problems because of perceived discrimination and subjectivity in the final decision making. This Court issued a preliminary injunction precluding use of the so-called "assessment center" for the purpose of promotions.

Indeed, none of the parties or their counsel have asked to reinstate the assessment center. The parties have engaged in lengthy and good faith efforts to build consensus for a new promotion process. A fairness hearing on the proposed consent decree is set for March 5, 1999. The parties have been advised of the costs, risks and the four-to-six-year time requirement for this matter to be resolved through litigation, and that no agreement will please everyone. Nevertheless, the Court has received hundreds of objections from police officers opposed to the proposed consent decree . . . .

Although the Court could become the de facto administrator of the San Antonio Police Department, the Court declines the opportunity, particularly in light of the fact there would be no extra compensation.

Another alternative is for the parties through their leadership to recommit themselves to their primary responsibility of protecting the citizenry of San Antonio. To this end, it would be necessary for the parties to sit down as mature adults with the objective of reaching a final agreement putting this litigation to an end and returning to full-time law enforcement duties for which they are being handsomely paid. Because significant numbers of the parties appear to prefer long-lasting litigation to resolution and agreement on a new promotion process, the Court ORDERS that plaintiffs' motion for implementation of the proposed consent decree is DENIED.

Until such time as this litigation is over or the parties form a broader-based consensus or until further Order from the Court, it is ORDERED the power to make final decisions on promotions is delegated and vested in Chief of Police Al Philipus, working with Deputy Chief Richard Glinser, Deputy Chief Manuel Longoria, Deputy Chief Albert Ortiz and Deputy Chief Jerry Pittman. This delegation of authority includes the opportunity, though no obli-

---

7. Returns without a signature or answer, and those which are illegible, were excluded from the total.

gation, to use part or all of the proposed consent decree or the collective bargaining agreement [with the exception of the assessment center] currently in effect.

Three weeks before the fairness hearing, intervenor SAPOA withdrew its support and filed objections to entry of the proposed consent decree. By a margin of three votes, the board of directors had overruled the executive board's approval of the settlement. Of the thirty-two members of the SAPOA board of directors, seventeen opposed the decree as presented; fourteen supported entry of a settlement. Nearly all objections were leveled against the point system included in the consent decree.

The Court sua sponte raised the issue of whether the intervenor had the power to block entry of the settlement:

The Court has reviewed Intervenor's Objections to Consent Decree (docket no. 131), which the Court infers is a withdrawal of earlier representations made to the Court the leadership of all participants including the intervenor San Antonio Police Officers' Association were in favor of the proposed consent decree (docket no. 104).

An intervening union does not have the power to block a consent decree unless the proposed decree would adversely affect the legal rights of the intervenor. *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 528–30, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (intervening union entitled to present evidence and have objections to promotion process heard at hearing on whether to approve consent decree, but has no power to block decree merely by withholding consent). The Eleventh Circuit has held a collective bargaining agreement can confer contractual legal rights which a proposed consent decree may affect adversely. *United States v. City of Hialeah,* 140 F.3d 968, 981–83 (11th Cir.1998) (police and firefighters' collective bargaining agreements conferred legal rights which proposed consent decree would affect adversely).

IT IS ORDERED that counsel for plaintiffs, defendants and intervenor are to file briefs on or before February 26, 1999, addressing: 1) whether the collective bargaining agreement confers legal rights upon the intervenor and 2) if so, whether the proposed consent decree would adversely affect legal rights of the intervenor.

Briefs were filed and the Court took the matter under advisement.

In preparation for the fairness hearing and in an effort to identify and apprise as many absent class members of the settlement as reasonably possible, plaintiffs, defendants and intervenor undertook an extensive notification campaign. The publication plan for distribution set forth in Plaintiffs' Notice of Proposed Settlement was approved and notice was published as follows: three consecutive days in the Daily Bulletin, published daily by the SAPD; and once in the Rap Sheet, published once a month by the SAHPOO. The notice was also made available at roll call, the office of the city clerk at city hall, the offices of the SAPOA and the offices of the SAHPOO. The notice advised members of the proposed class they did not need to appear at the fairness hearing if they were satisfied with the proposed settlement, but could do so. The notice further advised settlement class members and others who intended to object to the fairness of the proposed settlement they must serve any objection and notice in writing to plaintiffs' counsel on or before February 12, 1999. Other than challenges to the point system, no objections were received in response to the notice.

The fairness hearing was held on March 5, 1999. The Court heard from counsel; plaintiffs' witness, Sergeant Richard Garcia; defendants' witness, Al Philippus, Chief of the San Antonio Police Department; and objection witnesses for the intervenor, Lieutenant Sonia Mary Domingues, Lieutenant Vidal Resendez, Sergeant Robert Dale Lambert, Sergeant Tracy Powers, Sergeant Thomas White, Detective Timothy Bigham, Detective Shawn Ury, Sergeant Christine Watren and Detective Tommy Alan Bearden. Chief Philippus and Sergeant Garcia testified in favor of the decree. However, as expected, criticism of the proposed point system ran high.

Lieutenant Domingues, who has been with the department for over fifteen years, testified she is certified bilingual and also has a bachelor's degree in human resources management from the University of Texas. She stated she nonetheless objects to the inclusion of bilingual and educational points in the settlement agreement. These issues, she opined, are better left to the collective bargaining process:

> The only recognized bargaining agent of the police officers of this department is the SAPOA. And as such ... contracts are voted on and they either pass or fail based on the wants and the needs of the membership.

Lieutenant Resendez has also been with the department for over fifteen years. He testified he is against the deduction of a promotional point for a suspension of more than thirty days. Sergeant Lambert, a thirteen-year veteran with the SAPD, stated he objects to the point system as an infringement upon his rights under the collective bargaining agreement. He stated:

> The collective bargaining agreement between the City of San Antonio and the sole bargaining agent, the SAPOA, provides a promotional system that is the best, both fair and equitable. Although at times it may not be perceived as such by a limited few, it remains the best method. And the membership of the SAPOA has on two occasions expressed and voted [to reject the point system] of the proposed consent decree.

Sergeant Powers has been a San Antonio police officer for eleven years and has a college degree. Yet, he objects to the point system, including the educational credit:

> I give a lot of credit to the passion to which the SAHPOO's going through to right a wrong they believe exists.... However, we have [the SAPOA], a collective bargaining unit [which] works on these things. And it is my feeling that going outside of that system to [a] court of the law ... is basically discrediting everything that the officers before me have done and our [SAPOA has] done in the past.
>
> The two principal things I disagree with [are] the educational points and the point

for secondary language, and I also have some problems with the punishment phase by [ ] deducting a point from individuals.... I would like to have the opportunity to vote on [these issues] in a contract and not have someone else decide that for me.

Sergeant White has served San Antonio citizens for over fifteen years. He testified he objects to the point system because promotional issues are more properly handled through the collective bargaining process. Detective Bigham is also a fifteen-year veteran of the police force. He believes a second language skill and college degree are admirable achievements, but states his duties as a career police officer have prevented him from obtaining either. The point system, he opined, is a matter which should "be addressed as a contract issue" through the SAPOA and the department.

Detective Ury has been with the department for five years. He has completed 160 hours of college credit and earned a degree in Arabic language skills from the Defense Language Institute. Nonetheless, he voiced opposition to promotions based upon bilingual ability and college credit. Sergeant Watren has been with the SAPD for fourteen years. She testified against the point system on behalf of a large number of officers who were not present at the fairness hearing.

> I've been approached by many, many other officers asking that I ... [voice] their opposition which [is] in agreement with mine.... And as long as they knew that there was some[one] representing their feelings, they felt they didn't need to [testify at the fairness hearing]. But, if each officer who is in opposition to this felt that [he or she] needed to be here in order for the message to get across, I'm sure that this [courtroom] would be filled. And I just wanted you to know [their lack of presence is not due to] apathy. It's just that [those officers] feel they are being represented by [the officers who are testifying here today].

She opined life experiences are as important as college credit and if points are to be awarded for educational attainment, points

should also be awarded for success in the areas of parenting and community service. Sergeant Watren also stated several officers believed the language points were discriminatory against those who were not Hispanic or had not grown up in a Spanish speaking household.

Detective Bearden was the final officer to voice his opposition to the point system during the fairness hearing. He has served the citizens of San Antonio as a police officer for twenty-two years and is the fourth son of five boys. Detective Bearden's father was in the military and served in World War II. His eldest brother served as a United States Marine in the Korean War; his second eldest brother served in the Army in Vietnam; his third eldest brother is a sergeant with the SAPD presently assigned to central patrol; and his youngest brother serves in the military in peacetime in Korea. This "quintessential foot soldier of this great city for this police department" states the language and educational points would create animosity among officers and "when it comes to a special skill that an officer has, we can deal with that in the collective bargaining agreement."

## STANDARD OF REVIEW

Rule 23(e) of the Federal rules of Civil Procedure provides no standard by which a court is to consider the settlement of a class action. Rather, the rule states:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Case law, however, provides a general measure for considering settlements: "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable. Approval of the settlement under this standard is not to be upset unless 'the trial court clearly abused its discretion.'" *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981). The general rule applicable to the Court's exercise of its discretion in deciding the fairness of a proposed class action is that the Court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D.La.1993). In addition, the Court acts "as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Morales v. Turman*, 569 F.Supp. 332, 337 (E.D.Tex.1983).

There is a strong presumption in favor of finding the settlement fair. *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 527 (E.D.Tex.1995). The proposed settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *Id.* at 527–28. " 'Compromise is the essence of settlement,' and the court may 'rely on the judgment of experienced counsel for the parties.' " *Id.* at 528 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977)).

In assessing whether a settlement is fair, adequate and reasonable, the Fifth Circuit has stated six key points or *Reed* factors should be considered. These factors are:

1. the existence of fraud or collusion behind the settlement;

2. the complexity, expense, and likely duration of the litigation;

3. the state of the proceedings and the amount of discovery completed;

4. the probability of plaintiffs' success on the merits;

5. the range of possible recovery; and

6. the opinions of class counsel, class representatives, absent class members and objectors.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983); *see Ahearn*, 162 F.R.D. at 528 (court used these factors in assessing fairness of settlement). In applying these factors, the Fifth Circuit has admonished courts to be mindful of the "overriding public

interest in favor of settlement" in class action suits. *Cotton,* 559 F.2d at 1331.

## REJECTION OF THE POINT SYSTEM PORTION OF THE PROPOSED SETTLEMENT

### THE POINT SYSTEM

██ As noted, the Court must consider objections raised to the proposed consent decree when determining whether the settlement is fair, adequate and reasonable. In criticizing the adequacy of the challenged portions of the settlement, three basic arguments are presented:

1. The settlement should not provide a promotional point for bilingual ability.
2. The settlement should not provide promotional points for educational attainment.
3. The settlement should not provide for deduction of a promotional point for officers suspended more than thirty days.

In addition to these complaints, some objectors expressed concern about whether the entire point system should be left to the collective bargaining process.

As presented by class counsel at the fairness hearing, negotiations were strenuous concerning the addition and subtraction of promotional points. During negotiations, defendants sought a greater number of points for education; as a compromise the language point was agreed upon. The SAPOA wanted more points than the three originally allocated to time in rank, so the number was increased to five. The time in rank points were intended to offset or equalize the education and language factors. Plaintiffs' witness Sergeant Richard Garcia explained: "that way, for example, an officer who had been a sergeant for seven years and who did not have a college degree would still get some advantage from the terms of the decree." The collective bargaining agreement provides only for a ten point maximum for time in service. In the collective bargaining agreement, no points are provided for time in rank, bilingual ability or educational attainment and no points are deducted for a suspension resulting from disciplinary proceedings.

The stated purpose of this litigation is to "seek legal means to correct the systemic patterns and practices existing within the working and contractual environment of the San Antonio Police Department to discriminate against Hispanic members of the police force." During negotiations it became apparent the parties were striving to achieve a broader goal: "to change the discriminatory system of patterns and practices to assist in the discrimination against no one" such that "everyone within the San Antonio Police Department shall have equal opportunity [to] all [of] the rights, benefits and privileges of employment." In a perfect world, the parties would be able to achieve both the narrow and the broad through the approval of the consent decree. Unfortunately, we are not in a perfect world and this is not a perfect document. Even though the product of intense negotiations, the point system cannot be accepted unless it is fair, adequate and reasonable.

██ The education points, although facially neutral, may impact Hispanics more harshly than Anglo officers. SAPOA cites a January 5, 1996, degree analysis of the department which shows only 17.3% of Hispanic officers have bachelor's degrees and only 1% have master's degrees. On the other hand, 33% of Anglo officers have bachelor's degrees and 2.4% have master's degrees.[8]

---

8. A police department may require applicants to have completed college credit despite a statistically significant disparate impact on a minority group. *Davis v. City of Dallas,* 777 F.2d 205, 207–23 (5th Cir.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986). To meet its burden, however, the city must introduce evidence showing that the job is related to the educational requirement. *Id.* at 217–18. At the fairness hearing, defendants cited *Davis* and directed this Court to the Fifth Circuit's discussion of the reports and expert testimony introduced by the City of Dallas. Although that rendition of the nationwide studies was instructive generally, the documents themselves were not introduced into evidence in this case. More importantly, although some opined a college degree is beneficial to law enforcement personnel, defendants introduced no evidence to show how the educational requirement in the proposed consent decree bears a manifest relationship to

Regarding the broad purpose of the settlement, the language point, although neutral on its face, may impact Anglo officers more harshly than Hispanics. At the fairness hearing, objectors expressed concern that a larger number of Hispanic officers grew up speaking Spanish than did their Anglo counterparts.

Moreover, officers currently receive additional monetary compensation for collegiate achievement and bilingual ability. College degrees can earn an officer up to $250 per month; a bilingual officer is entitled to a monthly salary increase of $50. The objectors make a persuasive argument when saying it is not fair or reasonable to compensate these officers twice (once with extra money and then again with extra points in the promotions process). Intervenor maintains to provide promotional points to bilingual officers gives preferential treatment to Hispanic officers.

As to the deduction of a promotional point, objectors make an argument akin to double jeopardy. They suggest an officer who has been suspended for more than thirty days has already been punished once. To punish again by deducting a point from the promotional test score, they opine, is overly harsh and unfair.

Reaction to these unfavorable comments has not been to dismiss them as unfounded, but to consider the point system as a product of give-and-take negotiation. Although this may be true, criticism of the point system is strong and well taken. It appears neither the narrow purpose of creating a level playing field for Hispanic officers, nor the broad purpose of creating a level playing field for all officers, is met through awarding or deducting points for bilingual ability, educational attainment or disciplinary proceedings.

Additionally, the point system touches on areas irrelevant to plaintiffs' claims of racial discrimination. *League of United Latin Am. Citizens v. Clements,* 999 F.2d 831, 846 (5th Cir.1993) (settlement agreement must arise from pleaded case and further objectives of law upon which complaint is based) (citing *Local No. 93, Int'l Ass'n of Firefighters v.*

*City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). The propriety of deducting a promotional disciplinary point, for example, is not a matter of immediate concern for resolution of plaintiffs' discrimination claims. The promotional point system is an independent matter involving distinct, though valid, concerns which have more to do with the collective bargaining process than the compromise of this case. For these reasons, the Court does not find the point system standing alone to be fair, adequate and reasonable.

### THE COLLECTIVE BARGAINING AGREEMENT

Even if it can be proved the point system is fair, adequate and reasonable in and of itself, it must also be fair, adequate and reasonable in light of the collective bargaining agreement. *W.R. Grace Co. v. Local Union 759,* 461 U.S. 757, 771, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (public policy dictates parties to collective bargaining agreement "must have reasonable assurance that their contract will be honored"). This requires a determination of whether the proposed consent decree would adversely affect legal rights guaranteed San Antonio police officers under the collective bargaining agreement. *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In *United States v. City of Miami,* 664 F.2d 435, 446 (5th Cir.1981), the decree provided that, when a minority employee had the greatest seniority in a particular position and was qualified for a promotional opportunity, the city was required to promote that minority employee unless another applicant had demonstrably superior qualifications. This provision of the decree conflicted with the police officers' collective bargaining agreement which guaranteed that promotions would be made on the basis of civil service examination scores. The Fifth Circuit found the decree adversely affected the legal rights of the intervenor because it impinged upon rights specifically guaranteed in the collective bargaining agreement. *Id.* A mandate

the position of officer on the San Antonio police

force.

issued suggesting the proposed decree be modified to provide that it would not affect the promotions of the objecting employees. *Id.* at 448.

In *United States v. City of Hialeah,* 140 F.3d 968, 972 (11th Cir.1998), the decree provided new minority hires would receive retroactive seniority dating from six months after their original application for employment. This provision conflicted with the police officers' collective bargaining agreement which guaranteed shift preferences, transfer requests, mandatory overtime and promotions would be made strictly according to accrued time in service. *Id.* at 981–82. Our sister circuit found a grant of retroactive seniority would alter the rights and benefits of incumbent officers under the collective bargaining agreement. *Id.* at 983–84. Approval of that part of the proposed decree over the unions' objections would, the Court concluded, violate the police officers' collective bargaining rights. *Id.*[9]

In this case, the collective bargaining agreement confers legal rights which the point system portion of the proposed consent decree would affect adversely. That document provides seniority rights relating to promotions. Article XI defines seniority as "all years of service, whether interrupted or uninterrupted on the San Antonio Police Department, and not merely the last continuous period of service." The provision further describes the right which seniority confers upon police officers. "Each police officer shall be given one point on a promotional examination for each year as a classified police officer in the San Antonio Police Department. In no event shall the number of such seniority points exceed ten (10)." Because allocation of promotional points is strictly according to seniority in rank, a grant of points under a new system to some individuals infringes on other employees' accrued contractual seniority rights. Specifically, the point system contemplated by the settlement agreement would curtail the pro-

motional rights of some incumbent officers. It would effectively grant officers with less seniority additional points on the promotional exam they would not otherwise receive.

Plaintiffs and defendants contend the proposed point system would not harm the interests of current police officers because there is no retroactive grant of seniority, as there was in *City of Miami* and *City of Hialeah.* They argue all officers have an equal opportunity to earn language and educational credit because the point system does not go into effect until eighteen months after entry of the decree. While this statement may be true in fact, it is not fair, adequate and reasonable in practice. It would be difficult, if not impossible, for an average citizen to become bilingual or earn a college degree in eighteen months. The Court can certainly contemplate a situation under which a police officer, charged not only with family responsibilities but with keeping the citizens of San Antonio safe, could not obtain bilingual or college credit in this time period. In fact, Sergeant Watren testified at the fairness hearing her family obligations as a single parent not only prevent her from attending college, but severely limit her study time for departmental promotions. Detective Bearden testified he has not had time during the twenty-two years he has been on the police force to learn bilingual skills or obtain an advanced degree. It is unlikely the eighteen month delay between the entry of the decree and the implementation of the point system would provide the opportunity for these and other officers to acquire the skills necessary to obtain the proposed promotional points.

Moreover, the objectors are not required to prove with certainty they would be injured by the proposed promotional scheme. *See United States v. City of Hialeah,* 140 F.3d 968, 982 (11th Cir.1998). It is enough they show the point system may cause an incumbent officer to lose a promotion. *See id.* (objectors not required to prove with certainty particular employees would lose contractu-

9. In *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Supreme Court held modification of otherwise legally enforceable seniority rights may be part of a necessary and appropriate remedy. The *Franks* decision, which concerned the pro-

priety of "make-whole" relief following a finding of discrimination in violation of Title VII, did not involve a consent decree and is not applicable to cases such as this where no finding of discrimination has been made. *See City of Hialeah,* 140 F.3d at 980.

al benefits). Citing the Fifth Circuit's opinion in *United States v. City of Miami*, 664 F.2d 435, 446 (5th Cir.1981) (Rubin, J., concurring), the Eleventh Circuit explained:

> In *City of Miami*, the Court invalidated parts of a consent decree altering the city's procedure for promoting police officers even though it was impossible to determine in advance which—or even that—officers would be affected by the change; the mere threat of injury to contractual rights was held to be sufficient.

*Id.*

Seniority subject only to time of service is not the same as seniority subject to additional points for time in rank, bilingual ability and education, along with a reduction of one point for a suspension of over thirty days. Nowhere in the collective bargaining agreement is the city, or anyone else for that matter, authorized to modify promotion rights across the board. *See id.; see also People Who Care v. Rockford Bd. of Educ.*, 961 F.2d 1335, 1337 (7th Cir.1992) ("When the parties to a decree seek to enlarge their legal entitlements—to grant themselves rights and powers that they could not achieve outside of court—their agreement is not enough").

█ Texas law supports the determination the proposed point system would controvert the contractual rights of San Antonio police officers. Generally, it is against Texas public policy for any official or group of officials of the state to enter into a collective bargaining contract with a labor organization respecting the wages, hours or conditions of employment of public employees. TEX.REV. CIV.STAT.ANN. art. 5154c (Vernon 1987). Firefighters and police officers, however, have the right to organize and bargain collectively with their public employer as to wages, hours, working conditions and all other terms and conditions of employment if their city, town or political subdivision adopts the Fire and Police Employee Relations Act ("FPERA"). *Id.* art. 5154c–1 § 5(a). The

City of San Antonio adopted the FPERA by election on December 18, 1974, thereby giving San Antonio police officers the right to bargain collectively with the city. *City of San Antonio v. San Antonio Park Rangers Ass'n*, 850 S.W.2d 189, 190 (Tex.App.—San Antonio 1992, writ denied); *see also* Collective Bargaining Agreement by and Between the City of San Antonio, Texas, and the San Antonio Police Officers' Association, Preamble (stating collective bargaining agreement is recorded in accordance with FPERA). This right includes important terms of employment, such as promotions. *See United States v. City of Miami*, 664 F.2d 435, 446 (5th Cir.1981). "Altering collectively bargained benefits through non-collective bargaining mechanisms is contrary to [Texas] law." *United States v. City of Hialeah*, 140 F.3d at 968, 983 (11th Cir.1998).

Furthermore, as stated in *City of Hialeah*, public policy dictates that parties to a collective bargaining labor agreement live up to the terms of that agreement.

> "[P]arties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 771, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983). One party to a collective bargaining agreement cannot use the device of a nonconsensual consent decree to avoid its obligation, which the other party negotiated and bargained to obtain. As we have previously observed in these circumstances: "The .... cases hold that, when a subject is encompassed within the terms of an existing contract, a public employer may not foreclose bargaining on the subject or unilaterally alter the terms and conditions of employment." *City of Miami*, 664 F.2d at 447.[10]

*Id.*

█ Finally, "[a] consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based." *League of United Latin*

---

**10.** On October 1, 1981, the Fifth Circuit of the United States Court of Appeals was divided to create the new Fifth and Eleventh Circuits. Although the Fifth Circuit's decision in *City of Miami* was released after the circuit split, the Eleventh Circuit considers the opinion "part of the law that is binding upon subsequent panels in [the Eleventh] Circuit." *City of Hialeah*, 140 F.3d at 975.

*Am. Citizens v. Clements,* 999 F.2d 831, 846 (5th Cir.1993) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). Courts must be exceptionally cautious when litigants seek to achieve by consent decree what they could not achieve by their own authority. Consent is not enough when parties seek to grant themselves powers they do not hold outside of court. *Id.* If the City of San Antonio wants to alter the manner in which competitive promotion benefits are allowed, it must do so at a bargaining table at which the union is present. For these reasons, the Court does not find the point system fair, adequate and reasonable in light of the collective bargaining agreement.

## ACCEPTANCE OF THE REMAINDER OF THE PROPOSED CONSENT DECREE

### THE REED FACTORS

#### *The Existence of Fraud or Collusion Behind the Settlement*

■ Having held several conferences with counsel and the parties, the Court finds no evidence of any fraud or collusion behind the settlement but finds the settlement was the result of hard fought, arm's length negotiations. In addition to experienced class and defense counsel, the intervenor is expertly represented. Undisputedly, all parties are vigorously represented. Although settlement negotiations began at an early stage, it took almost five years to resolve the issues. Many officers and former officers, public officials and citizens gave their time and effort without compensation to the process. The mediation was a continuing process, spanning years, with a series of face-to-face meetings and telephone conferences during the interim periods between the parties on a daily basis. At the Fairness Hearing, the Court explained:

> [T]his particular kind of case and this particular procedure is called a fairness hearing, and it is not an adversary system or hearing in the usual sense of the word that we contemplate.

But rather, because of these cases which involve relatively large numbers of human beings, the law and the rules of procedure contemplate and have a procedure for these matters to be resolved, if they can be, by negotiation and resolution among the parties with the assistance of their counsel.

The Court concluded: "And so, it is clear to the Court, and without any doubt that all of the people involved in this have entered into good faith efforts to try to resolve this matter...." Finding no evidence to the contrary, the Court finds the settlement free of fraud or collusion.

#### *The Complexity, Expense, and Likely Duration of the Litigation*

Having previously reviewed the history of this litigation, there is no doubt this case is procedurally and substantively complex. Were the case to proceed to trial, the issue concerning class certification may become a battleground before the Court could even consider the various issues concerning the merits of the case. Moreover, the most conservative estimate of the time needed for trial is three to four weeks. Given this Court's criminal docket, it is uncertain when the parties could expect a trial without interruption. Not only would a lengthy trial consume court resources, but the case would also be subjected to lengthy appeals. As the Court stated at the fairness hearing: "The full litigation route [involves] risks and costs, not only monetary costs, but also damage to the department and to the city." "That of course would be the nature of a trial if you were to go into full battle gear and employ the metaphor of battle and war as opposed to the metaphor of diplomacy, which at least we're trying to do so far." One court put this perspective on the issue:

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush."

*In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D.La.1993) (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D.Colo. 1974)). The Court is satisfied this factor is met.

### The Stage of the Proceedings and the Amount of Discovery Completed

 The extent of discovery needed in order for the parties to have sufficient information to make an informed and reasoned evaluation of the settlement and for the Court to be able to determine the fairness and adequacy of the compromise is left to the discretion of the Court. *See Cotton v. Hinton*, 559 F.2d 1326, 1332–33 (5th Cir. 1977). Sufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed.[11] *Id.* Additionally, a court may consider information available to the parties which was developed in prior or related proceedings. *See Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 528 (E.D.Tex.1995) (factual and legal issues identified and developed through extensive litigation; class counsel thoroughly familiar with asbestos litigation in general).

Here, formal discovery in relation to the class action was conducted and the exchange of informal discovery was done. Moreover, counsel have a wealth of information gained from litigating discrimination cases involving public entities. The parties also engaged in extensive document review and consultation with experts. Class counsel, defense counsel and SAPD personnel undertook a nationwide survey of the policies of all the major law enforcement departments throughout the United States. They "carefully looked at each and every department, chose, borrowed, [and] ignored a lot of things quite frankly" to determine what procedures would best serve the City of San Antonio. This was a difficult task because "there is not a lot of consistency nationwide on these issues." Unquestionably, the parties have adequate information from which to decide whether to settle the case, and the Court has ample information from which to decide if the settlement in the absence of the point system is fair, adequate and reasonable.

### The Probability of Plaintiffs' Success on the Merits

 Once the issue of possible fraud or collusion behind the settlement is removed, the next most important factor in deciding the fairness, adequateness, and reasonableness of the settlement is the likelihood of plaintiffs' success on the merits if the case were to proceed to trial. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). In making this determination, the Court must compare the terms of the settlement with the "likely rewards the class would have received following a successful trial of the case." *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). However, the Court is not to decide the issues or try the case via the fairness hearing because, "[t]he very purpose of the compromise is to avoid the delay and expense of such a trial." *Id.* (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir.1971)).

At the fairness hearing, class counsel discussed the strengths and weaknesses of their case and apprised the Court of some of the factors which were taken into consideration in their determination the settlement is fair, adequate and reasonable. Among the factors are: (1) many of the patterns of discrimination and/or retaliation against Hispanics in the department have been eliminated by the current administration and, in particular,

---

11. The Fifth Circuit in *Cotton v. Hinton*, 559 F.2d at 1332, expressed concern many litigators hold the common belief great amounts of formal discovery must be taken in each case. The Court explained:

> We have often seen cases which were "over discovered." In addition to wasting the time of this Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial. The Court should rarely be required to intervene. Being an extra judicial process, informality in the discovery of information is desired. It is too often forgotten that a conference with or telephone call to opposing counsel may often achieve the results sought by formal discovery.

*Id.*

Chief Philippus; (2) the substantial cost of trial where the result is always uncertain; (3) the consideration that a trial and subsequent appeals could take years. Defendants presented to the Court their perspective on the case and maintained plaintiffs would be faced with substantive obstacles if the case were tried; the most significant obstacle being substantive legal and factual defenses to plaintiffs' discrimination and retaliation allegations.

Although each party still vigorously believes it will prevail if the case proceeds to trial, all recognize the uncertainty of litigation. Plaintiffs believe the settlement gives them much of what they originally asked for in their complaint and constitutes a significant step toward ensuring defendants provide a nondiscriminatory working environment to SAPD officers. Keeping in mind the Court is not to try the case or decide the issues, the Court finds sufficient risk to each side that the outcome of continued litigation is unpredictable and the substantial risk to each side as to the ultimate outcome strongly favors settlement. As the Court stated at the fairness hearing, this is especially true in light of the fact public safety depends upon these officers "living together, working together and covering each other's backside for the foreseeable future."

### The Range of Possible Recovery

■ In determining whether the settlement is reasonable in light of the range of possible recovery factor, the Court is to "determine the value of the settlement in light of the potential for recovery." *In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D.La.1993). This analysis requires the Court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors,[12] determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 213 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982) &

456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). As in *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir.1983), the proponents of the settlement here did not provide this Court with an "express estimate of the range of possible monetary recovery should plaintiffs prevail at trial." The Court, however, was provided with arguments from each side concerning their respective positions on the merits of the asserted claims, the risks associated with continued litigation, and the advantages to and value of the settlement. Moreover, the recovery sought in this case is purely declaratory and injunctive relief.

■ The parties agree the settlement with the exception of the point system is a reasonable balance between the needs of Hispanic officers and the budgetary and administrative constraints of the police department. Additionally, the avoidance of future litigation is contemplated by the implementation of the agreement. Once the case is dismissed the antidiscrimination laws will be enforced by defendants without the necessity of litigation or court supervision. The issue of discrimination in the form of a hostile working environment has been addressed through setting standards under which officers are to comport themselves regarding issues dealing with race, ethnicity, cultural differences, national origin, religion, age and gender. Another important provision of the agreement provides for an on-going forum to continue to work with problems which may not have been anticipated or to correct problems which may not have been seen at the time the agreement was drafted. Of course, this Court recognizes the recovery range of a jury verdict could be more or less depending upon how the jury perceives the evidence and the costs and expenses incurred in continuing the litigation to trial. *In re Shell Oil Refinery*, 155 F.R.D. 552, 565 (E.D.La.1993). The calculation of the possible range of recovery cannot be mathematically precise. *Id.* This Court finds, based on the evidence heard and its experience in conducting trials, the proposed settlement is within the range

---

12. Factors that the court considered potentially relevant were "the complexity, expense and likely duration of the litigation ..., the reaction of the class to the settlement; [and] the stage of the

proceedings ...." *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 217 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d at 453 (2d Cir.1974)).

of possible injunctive and declaratory recovery.[13]

### The Opinions of Class Counsel, Class Representatives, and Absent Class Members

#### Opinions of Class Counsel and Class Representatives

As noted, the settlement was presented to the Court after long, hard-fought negotiations between the parties. With the exception of some disagreement about the point system, counsel endorse the settlement. In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to "assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arm[ ]s length negotiations between experienced, capable counsel after meaningful discovery." *Lelsz v. Kavanagh,* 783 F.Supp. 286, 297 (N.D.Tex.1991) (quoting MANUAL FOR COMPLEX LITIGATION § 30.41), *aff'd without opinion,* 983 F.2d 1061 (5th Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 236 (1993). As to the class representatives, the Court heard testimony from Sergeant Richard Garcia. Sergeant Garcia explained to the Court the various problems he had encountered in his capacity as president of SAHPOO from 1994 to 1996. He submitted a letter sent in 1992 from SAHPOO to SAPOA outlining some of the concerns Hispanic officers faced within the SAPD. These included unfair labor practices and patterns of discrimination and retaliation against minorities in the department. Sergeant Garcia affirmed he had reviewed the settlement and agreed the settlement should be approved by the Court.

In addition to this witness, Chief of Police Al Philippus testified. He explained the steps he has taken to rid the department of discrimination and/or retaliation, real or perceived, in the four years he has occupied the position as chief. He discussed the assessment center process and explained the problems associated with a purely subjective evaluation. He stated there was a trend in cities outside of San Antonio to utilize the same type of secondary testing mechanism to evaluate the candidate based upon skills as that contained in the proposed settlement agreement. Chief Philippus also affirmed he had reviewed the settlement and requested the Court to approve its entry.

#### Opinions of Absent Class Members and Police Officers

In addition to the opinions of class counsel and class representatives, the Court is also to consider the opinions of absent class members. In doing so, the Court should carefully weigh the number and nature of objections while keeping in mind the settlement can be fair even if a large number of class members oppose it. *Reed v. General Motors Corp.,* 703 F.2d 170, 174 (5th Cir.1983). The Court should also recognize "a low level of vociferous objection is not necessarily synonymous with jubilant support[,]" but great support for the settlement can certainly be a factor favoring approval. *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 217–18 (5th Cir.1981); *see Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) (in assessing fairness of proposed settlement, number of objectors is factor to consider but not controlling). The number of objectors should be considered carefully. *Reed,* 703 F.2d at 174.

As discussed above, the vast majority of objectors protested only the point system contained in the proposed consent decree. A few, however, opposed the settlement as unnecessary. Objections in this category range

---

**13.** The Fifth Circuit has agreed with comments by the Second Circuit in its confirmation of a settlement which resulted in recovery of only 12% of the potential recovery. *Parker v. Anderson,* 667 F.2d 1204, 1210 n. 6 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). In this opinion, the Second Circuit stated:

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.
> [n. 2] In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 & n. 2 (2d Cir.1974).

from claims of lawsuit abuse to "change for the sake of change" to the firm belief there is no discrimination or retaliation against Hispanics within the department. More likely than not, these objectors are not aware this case will proceed to trial as circumstances were on the date suit was filed, January 13, 1994. Times were apparently more volatile then, as evidenced by the fact plaintiffs filed suit in Midland claiming they could not get a fair trial in San Antonio. Although the consensus among SAPD officers is that discrimination, if any, has dissipated during the last five years, particularly under the command of Chief Philippus, the jury will hear evidence as it allegedly existed in January of 1994. It seems a needless waste of time, money and resources to compel plaintiffs, defendants, and intervenor to proceed to trial on outdated allegations when the proposed settlement contemplates a race neutral process for administering the police department now and in the future. As defense counsel stated at the fairness hearing:

> One never knows what a jury might do. Certainly different facts and different allegations are subject to different interpretations and perceptions. This is a case that if it went to trial, I would estimate would probably last three weeks, four weeks, maybe longer. And so, from the standpoint of avoiding legal fees and not taxing the judicial resources or disrupting the department, the city and the SAPD have reached the conclusion that we certainly would like to see this matter resolved.

The Court has reviewed all the data. Even if the settlement were not approved, the case proceeded to trial, and discrimination in 1994 was proved, the remedy would be an injunction. The more logical means to this end seems to be a settlement agreement carved out by the parties addressing specific concerns, rather than a general injunction issued by the Court. Although no doubt grateful to these objectors for their support of the current administration, the city and Chief Philippus have expressed their desire for Court approval of the proposed consent decree.

The Court also notes a general concern the settlement may result in reverse discrimination against Anglo officers. As provided, the consent decree reflects changes which will improve the working conditions and terms and conditions of employment in the City of San Antonio Police Department for all officers, regardless of race, or gender, for that matter. The department has committed itself to recruit in a more intensive manner and in such a way as to attract the best qualified candidates for the department available. It will recruit consistent with the law enforcement needs of the city, the department's policy of community based policing and state and federal law. It has committed itself to devote sufficient resources to achieve those ends. The department has revamped its applicant processing system, validated its testing program and established a revised interview board to assess the suitability of candidates to be hired by the department. It will comply with federal and departmental standards for hiring. The SAPD has agreed to make assignments within units and geographic areas in a non-discriminatory manner consistent with the law enforcement needs of the city. The department has restructured its Internal Affairs Department by renaming it to the Professional Standards Unit, and also making significant changes to more fairly address complaints against all officers, whether filed by the public or by fellow officers. The advisory action board has been restructured to include citizens of the City of San Antonio and to provide for more openness and to protect the officers who have been charged with offenses regardless of their national origin or race. Specialized law enforcement training is to be made available to all in the department on a more equitable and more inclusive basis. Diversity training with substantive meaning will be required of all supervisory and management level officers, including deputy chiefs and the chief himself. Promotions to the ranks of detective and sergeant will be made under validated examinations which are job related. As previously discussed, the assessment center will be eliminated and replaced with objective examinations which test judgment, knowledge and adaptability. Employment and assignment opportunities will be disseminated on a much broader basis to allow as many officers throughout the department to

be aware of such openings and to be able to apply for those positions if they so choose and if they qualify. The issue of a hostile working environment will be addressed by the chief. Standards shall be implemented under which the employees of the department are to comport themselves regarding issues dealing with race, ethnicity, cultural differences, national origin, religion, age and gender. Undercover assignments will be on a voluntary basis subject to the availability of volunteers who are qualified, capable and suitable for the job. Overtime assignments and pay will be done in a nondiscriminatory manner. Considering the specifics of the proposed decree, and in the absence of evidence to the contrary, the settlement creates a level playing field for all officers regardless of race.

This does not mean the consent decree is perfect. As with any negotiation, there are matters over which reasonable minds will differ and there is not 100% unanimous agreement. It is the result of a compromise by three separate strong-willed parties. The documents reflect in certain discrete ways the will and desire of each of these parties to accommodate their respective members. The decree is also the result of the attorneys' attempt to negotiate this matter within the confines of the law. At the fairness hearing, class counsel stated:

> [C]ounsel took into consideration the *Adarand Contractors* case that this court is familiar with, the U.S. Supreme Court case which prohibits racially identifiable contractual arrangements. And also, during the [negotiations] the *Hopwood* decision came down. That set a pretty stark basis within which we had to operate as attorneys to craft something which was racially neutral. And I believe that we did that.....

Perhaps in a perfect world, unanimous agreement would and could be the result. However, as the Fifth Circuit has recognized "inherent in compromise is a yielding of absolutes and an abandoning of high hopes." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). A "just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugat-*

*ed Container Antitrust Litig.,* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982).

The Court is aware of the concern some officers hold as a result of the proposed decree and their motivation in seeking litigation in lieu of settlement is certainly sincere. Although plaintiffs have put forth their strategy to prove alleged discrimination and/or retaliation, they may be unable to recreate the racial tension prevalent in 1994, in a courtroom setting, at some point in the future. Plaintiffs have concluded there was a historic pattern of discrimination and retaliation; defendants have concluded there was not. With such conflicting opinions, it is reasonable a compromise be reached.

In gauging the reasonableness of a settlement, the Court must look to the potential result if the case were to be litigated, taking into consideration the substantive and procedural obstacles which plaintiffs would otherwise face. The objectors have not shown how they would leap these hurdles. The settlement is a major achievement by the parties which is intended to serve as a model for law enforcement departments nationwide. With the implementation of this process, the objectors too will benefit. Likewise, the objectors, like all other citizens of San Antonio, will benefit from a police department unburdened by protracted litigation. Accordingly, the Court does not find the settlement (with the exception of the point system) should be disapproved based upon these objections.

### Opinions of Objectors/Intervenors at Fairness Hearing

Objections at the fairness hearing focused upon the point system. As previously discussed, the Court considers these objections well-taken and declines to approve that portion of the proposed consent decree.

### CONCLUSION

After careful consideration of the proposed consent decree and the objections thereto, the pleadings on file and the entire record in this case, and for the reasons set forth above, the settlement (with the exception of the

point system) is hereby APPROVED as fair, adequate and reasonable.

It is so ORDERED.

## EXHIBIT A

## PROPOSED CONSENT DECREE

### I.

### *PRELIMINARY*

In this action, Plaintiffs and the class members they represent alleged employment discrimination by Defendants on the basis of national origin and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991 (hereinafter "Title VII"), and

Whereas, Defendants have appeared and answered and have denied all of the allegations of the Plaintiffs' Complaint and have further denied any and all liability to Plaintiffs and/or to the class they represent, and have also pleaded that the claims asserted by Plaintiffs are barred by certain affirmative defenses, and

Whereas, The San Antonio Police Officers Association was granted standing as a nonaligned Intervenor by this Court's Order signed March 31, 1994, and

Whereas, on this date, came PLAINTIFFS, DEFENDANTS and INTERVENOR herein who announced to the Court that they have mutually, voluntarily and fully resolved any and all issues pending among them in this litigation and have agreed to the entry of a Consent Decree reflecting the terms of their settlement, and

Whereas, the litigants have further requested that this Court enter a judgment and decree in accordance with the provisions they have agreed upon which are set forth below, and

Whereas the consent by the Defendants to the entering of this Consent Decree shall not be deemed to be an admission by the Defendants of the truth of any of the allegations contained in the Complaint, and

Whereas, this Court having considered the arguments of counsel, the positions of the various parties, and the interests of all concerned, is of the opinion that said decree and judgment should issue and be entered in accordance with the agreement of the parties.

Therefore, it is hereby ORDERED, ADJUDGED, AND DECREED that final judgment is hereby entered in this matter as follows:

### I.

### PRELIMINARY FINDINGS

A. This Court has jurisdiction over Defendants and the subject matter of this litigation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and 28 U.S.C § 1331.

B. The Court finds it appropriate to certify a class in this action as such class is defined in Paragraph II G, *infra.*

C. The parties have voluntarily agreed to the entry of a Consent Decree fully and completely resolving all issues in this litigation, the terms of which Decree are set forth and described below.

D. The litigants have further requested that this Court enter a judgment and decree in accordance with the provisions set forth below.

E. Therefore, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

### II.

### DEFINITIONS

As used in this Consent Decree, the following definitions and/or designations shall apply:

A. "The Chief" shall refer to the Chief of the San Antonio Police Department or his successors in office.

B. "SAPOA" shall refer to the San Antonio Police Officers Association, and its officers, directors, members, and successors in office.

C. "Plaintiffs" shall refer to the individually named persons and entities

named as Plaintiffs in this suit, *i.e.,* Alex Torres, Manuel Longoria, Raymond Ybarbo, individually and as President of Hispanic Police Officers' Organization, Robert Garcia, Richard Garcia, Linda Diaz, and "SAHPOO", the San Antonio Hispanic Police Officers' Organization, and its members.

D. "SAPD" shall refer to the City of San Antonio Police Department.

E. "SAHPOO" shall refer to the San Antonio Hispanic Police Officers Organization and to its past, future and present officers, directors, agents, attorneys, employees, representatives, membership, and individual members, as well as to all of the San Antonio Hispanic Police Officers Organization's successors in office.

F. "Parties" shall refer to all Defendants herein, all named Plaintiffs, all "class members", the attorneys for Plaintiffs and class members, SAPOA, and SAHPOO, as such entities and persons are defined herein.

G. "Class members" and/or "class" shall refer to and include all individuals referenced in Paragraphs C or E, above, all past and present Hispanic officers, and all past and present applicants for sworn positions with SAPD who were in any manner allegedly discriminated against on the basis of their national origin (Hispanic) within the meaning of Title VII and/or retaliated against within the meaning of Title VII.

H. "Defendants" shall refer to and include the named Defendants herein, *i.e.,* The City of San Antonio, its Mayor, City Council, City Manager, Chief of Police, and their successors in office, and the San Antonio Police Department.

I. "Notices". Wherever in this Consent Decree a notice to Plaintiffs, Intervenor, or Defendants is required or described as a part of any process, delivery of written notification of the matter by correspondence, hand delivery, or facsimile to that parties' counsel of record (or the individual designated by such counsel of record) shall constitute sufficient "notice".

## III.

### SCOPE, EFFECT AND PURPOSE

A. In accordance with the intent of the Parties hereto, this Decree resolves, compromises and settles any and all issues, allegations, rights, claims for relief, claims, remedies, claims for damages, demands, disputes, rights, claims for attorneys fees, costs, and litigation expenses, and causes of action which:

1. have been raised or asserted, either explicitly or implicitly, in the judicial Complaint filed by Plaintiffs and/or class members;

2. which could have been raised in the Complaint by Plaintiffs and/or class members;

3. which could have been raised in the Complaint by Plaintiffs and/or class members based on the specific allegations and causes of action contained in the Complaint;

4. which arise out of or which are in any manner related to any events, omissions, practices, words, conduct, events, policies, actions, facts, or allegations asserted in the Complaint;

5. which were raised, requested or asserted, either explicitly or implicitly, in any of the underlying charges of employment discrimination filed with the United States Equal Employment Commission ("EEOC") and/or the Texas Commission on Human Rights ("TCHR") by Plaintiffs, any Plaintiff, charging parties, and/or class members, Including, but not limited to, any and all in EEOC Charge No.'s 360–93–1685 and 360–94–0749; and/or

6. which could have been raised or asserted in the foregoing charge(s), amendments thereto, or any other EEOC or TCHR charges.

B. By way of example only, and without any intent to limit the scope or effect of this Consent Decree or any of the foregoing, the claims resolved, settled, and compromised herein include any and all which claim, rely

upon, allege, or assert employment discrimination on the basis of Hispanic national origin with respect to or related to: hiring, promotion, discipline, working conditions, employment opportunities, overtime pay, geographical assignments, disparate treatment, supervision, language duties, pay, performance appraisals, recruitment, undercover assignments, harassment, retaliation, compensation, nepotism, "good ole boy" system, selection, employment opportunities, testing, selection criteria, denial of credit for work related performance, stereotypical perceptions, promotional processes, tests, use of Spanish in performance of work duties, denials of promotion, denials of assignments, time for studying for examinations, progression to higher positions or assignments with higher levels of responsibility, handling of complaints; statements, cartoons, comments, or other matters offensive or discriminatory; failures to credit achievements; discipline; retaliation for taking any action protected under Title VII; discharge; delegation of responsibilities, discretion, functions, or authority to Fiscal Management Sections; discriminatory attitudes; training outside of the department; subjectivity in selection or evaluation processes; eligibility list rankings; employment benefits; employment policies or practices; assessment centers; job assignments; discharge; derogatory comments; hostile working environment; training opportunities; communication; budgetary allocations; perceptions; transfers; and/or any other term, practice or condition of employment which is alleged in the Original Complaint and/or underlying charges.

C. In accordance with the intent of the Parties, the terms of this Decree will be construed as broadly as possible to promote the intent of the parties described in the foregoing language. This Decree shall apply to and be binding on all Parties, their agents, servants, attorneys and successors in office. The terms of this Decree shall be accorded *collateral estoppel* and *res judicata* effect with respect to Plaintiffs, the class, and class members.

D. In exchange and in consideration for the Defendants' entering into and agreeing to this Consent Decree Plaintiffs, Alex Torres, Manuel Longoria, Raymond Ybarbo, individually and as former President of the San Antonio Hispanic Police Officers' Organization, Robert Garcia, Richard Garcia, Linda Diaz, and "SAHPOO" hereby waive, release, forego, discharge, and settle any and all claims, causes of action, demands, rights, and requests for relief described above in Paragraphs III A through C which they, individually or collectively, have or may have against Defendants. Therefore, Alex Torres, Manuel Longoria, Raymond Ybarbo, individually and as former President of Hispanic Police Officers' Organization, Robert Garcia, Richard Garcia, Linda Diaz, and "SAHPOO" hereby agree, promise, and stipulate that they will not opt out of any class found by the court to be appropriate, that they will not opt out or in any manner seek to be excluded from the coverage, effect, applicability and terms of this Decree as a final and binding resolution, settlement, waiver, and discharge of all of their claims, rights, causes of action, demands, requests for relief set forth in Paragraphs III A through C which each individually or together with others has, had, or may have against any Defendant or Defendants.

## IV.

### NON ADMISSION CLAUSE

This Consent Decree reflects and embodies the cooperative efforts by the Parties hereto to further the existing goal of the SAPD to maintain a work place environment free from unlawful employment discrimination. This Decree is entered into voluntarily by the SAPD and the other Parties in order to further enhance the internal harmony of the SAPD, improve dialogue and open communication, eliminate any misperceptions with respect to the SAPD, and also to avoid and eliminate the unnecessary burdens and expenses of litigation. Therefore, neither the fact that a Party has agreed to enter into this Consent Decree nor any language herein shall be construed as or constitute any admission, either implicit or explicit, by SAPD, The City of San Antonio, any other Defendant herein, or any party hereto of any past or present employment discrimination, retaliation, or any unlawful or discriminatory poli-

cies or actions. The other Parties hereby acknowledge and agree that it is the position of Defendants that they have not engaged in any discrimination and that Defendants deny all of the allegations in the Complaint. The Parties further agree that neither the entering into this decree nor any language herein shall be used or construed as evidence of any employment discrimination or unlawful action in any other litigation, court proceeding, administrative proceeding, or charge of discrimination. However, the foregoing shall not be construed to prevent the introduction of this decree in any proceeding for the limited purpose of seeking enforcement or modification of this Decree.

## V.

### PRINCIPLES OF INTERPRETATION

The parties hereto acknowledge and agree that the management and operation of the SAPD requires flexibility, adaptability, the ability to modify and implement practices and procedures quickly, efficiently, and the ability to respond to both short term and long term changes in circumstances, conditions, public needs, financial constraints, management priorities, and law enforcement requirements. Therefore, nothing in this Decree shall be construed as or given the effect of limiting any of the foregoing interests or any management prerogatives (present or future) of The Chief, the SAPD, or other Defendants herein, so long as such actions are in compliance with Title VII. Additionally, nothing herein shall be construed as in any manner authorizing or empowering any Court to substitute its judgment for that of the City of San Antonio and/or the SAPD in any proceeding regarding compliance or noncompliance with this Decree, so long as no violation of Title VII or the express and specific provisions of this Decree is established.

Additionally, nothing in this Decree, shall be interpreted or utilized to:

(i) Increase, decrease, affect in any way, supplant or interfere with SAPOA's role as the recognized collective bargaining agent for so long as that role

may be otherwise authorized or permitted by law; or

(ii) Excuse any noncompliance with the grievance and arbitration procedures in any existing Collective Bargaining Agreement when such compliance is necessary under said Collective Bargaining Agreement to process a grievance; or

(iii) Replace, modify, affect or vitiate any of the terms of any collective bargaining agreement, except as such terms may be specifically identified and expressly stated to have been modified hereby; or

(iv) Interfere with the efficient and independent operation and management of the SAPD; or

(v) Notwithstanding Section 143, Local Government Code, V.A.T.S., the provisions of the collective bargaining agreement as expressly modified herein, will apply.

## VI.

### DIVERSITY TRAINING PROGRAMS

A. "Diversity training" shall refer to instructive sessions having the purpose of sensitizing attendees to work place issues arising from a culturally, racially and gender diverse work force and reinforcing the principles of equal employment opportunities as expressed by Title VII and other statutes prohibiting employment discrimination. Before the start of every fiscal year, the Chief and/or his designee(s) will review the proposed budget and will include in said budget, sufficient funds for conducting diversity training. Such funds shall not exceed $25,-000.00 for the first year that this Decree shall be in effect and shall not exceed $25,-000.00 for any year thereafter until the expiration of this Decree by agreement, by its own terms, or by Order of this Court finding reason to discontinue such training, whichever of the foregoing occurs earliest. At the discretion of The Chief, and after notice to the parties, diversity training may be presented through existing city personnel, through external consultants, video presentations, or similar means or a combination of

any of the foregoing, provided, however, that if done by City personnel, the instructions and instructional content shall be supplied to the attorneys for the parties (or the individual designated by such counsel) before presentation. Within the limits imposed by the budget heretofore stated, diversity training will be scheduled so that each individual holding the position/rank of The Chief, Deputy Chief, Captain, Lieutenant, and Sergeant will be required to attend at least one such block of instruction consisting of at least 8 hours every twenty-four months.

B. The intentional refusal to participate in required diversity training will subject the officer to discipline.

## VII.

### PROMOTIONS TO DETECTIVE INVESTIGATORS, SERGEANTS, LIEUTENANTS AND CAPTAINS

The ranking of candidates on the eligibility list for promotions to the rank of Detective Investigators, Sergeants, Lieutenants, or Captain shall be undertaken through the utilization of the procedure and criteria set forth below. However, promotions to any particular rank through the implementation of this Article shall not be made until after the most recent promotion list for that rank under the former system has expired.

A. The Assessment Center process and points conferred through said process pursuant to Article XI, Sections 4 and 5 of the Collective Bargaining Agreement shall be eliminated as of the date of the entry of this Decree.

B. An officer's rank on a promotional eligibility list shall be determined by adding the points provided in Subparagraphs F(1) through F(5) below, if applicable, to the officer's score on the promotion exams. In the event the total score results in a tie, ranking on the eligibility list shall be done on the basis of seniority in rank. However, officers shall not be eligible for promotion and shall not be placed on any promotion list if the officer did not score at least 70 per cent on all of the promotional exams applicable to the rank to which he/she seeks promotion. All candidates for promotion who attain a minimum score of seventy percent (70%) on all applicable exams shall be placed on the eligibility list for their respective ranks. Within seventy-two hours of the final compilation of the total scores, the eligibility list will be established and posted. The duration of such list will be in accordance with past practice, collective bargaining agreement language, and/or Section 143 of the Local Government Code, unless modified by this Decree.

C. **Provisions Applicable to Promotional Examinations.** The promotional process to Detective Investigator, Sergeant, Lieutenant, and Captain shall include examinations prepared in accordance with the following:

1. The city shall engage an outside bonded consultant to prepare written promotional examinations for each rank.

2. Beginning at least eighty-five (85) calendar days before the administration of the examination, the city will announce in the Daily Bulletin the date of the examination, along with the location and dates that any eligible employee may sign up for the examination. This announcement will run for five consecutive business days. Candidates for the promotional examinations shall be required to register for same between eighty and seventy calendar days before the written examination.

3. **Study Material Committee**—The Chief shall establish a Committee for the selection of proposed study materials for each written promotional examination. This Committee may vary in number and in composition, but shall be chaired by the Training Academy Commander. This Committee may be comprised of individuals who are selected from within or outside of the SAPD, provided that if members from outside of the department are selected, they may not consist of more than 50% of the Committee. This Committee shall meet at appropriate times to review submitted materials. When the need arises to administer a promotional examination for any rank, this Committee shall convene and select proposed materials which are pertinent

to the rank for which the promotional examination is being administered. The proposed material will be forwarded to the Chief of Police (or in the event of the Chief's unavailability, her/his designee) who shall make the final selection of the materials.

4. The city shall attempt to obtain the publishers' permission to duplicate and distribute to the candidates the study materials without incurring any fee, cost, penalty or liability to the publishers and if it does obtain this permission, the city will bear the expense of the printing or reproduction of the study materials for distribution to eligible candidates. However, the city will not be required to perform the aforementioned printing, reproduction, and dissemination of the study materials if the permission of the publishers to do so cannot be obtained at no fee, cost, or penalty, or liability to the publishers. Where such permission cannot be obtained by the city, the city will make arrangements to ensure that all of the study materials are available to be purchased by the candidates by the same date as the other materials are made available. The candidate will be required to purchase any study materials (e.g. textbooks) for which the city was unable to obtain the foregoing permission to duplicate and disseminate the materials. Applicants who purchase study materials and who score 70 or higher on each of the examinations applicable to the promotion sought will be reimbursed for the price of the study materials pursuant to Art. XI § 2B of the collective bargaining agreement.

5. Where permission for duplication has been given in accordance with Subparagraph 4, above, to enhance the security of the process, after the Chief has made her/his selections, the city's Human Resources Department will pick up the materials and such materials will be printed and/or reproduced under circumstances which will promote security. The Human Resources Department will verify the completeness of the packets.

No question will be included in the examination unless it derives its source from the study materials.

6. The date and location that the study materials will be made available for candidates to pick up (when permission to duplicate them has been given by the publisher as described in Subparagraph 4, above) and, where permission for duplication has not been obtained, the location where they may be purchased will also be announced in the Daily Bulletin for five (5) consecutive business days. In accordance with the provisions and conditions set forth in the above and below paragraphs, the study materials shall be either announced or provided to eligible candidates during a period which is not more than forty (40) nor less than thirty (30) calendar days prior to the examination.

7. All eligible candidates for promotion to a particular rank shall be given the identical examinations applicable to that rank in the presence of each other. The examinations will consist of multiple choice written questions which shall have predetermined correct answers to enhance the objectivity of the examination.

8. The preparer of the test shall deliver it sealed and numbered to the Civil Service Director who is charged with the responsibility for the security of all promotional examinations. The examination shall remain sealed until opened in the presence of the participants.

9. All of the questions asked on the examination must be prepared and composed in a manner that the grading of all examination papers can be completed immediately after the examination is held. All examination papers shall be graded as they are completed, at the place where the examination is given, and in the presence of any candidates who wish to remain during the grading. A score of 70% (out of a possible 100%) on each exam applicable to the rank to which he/she seeks promotion shall be considered a minimum passing score.

10. In addition to the rights to observe grading specified above, each eligible promotional candidate shall have the opportunity to examine test source materials, his or her examination and his or her answers, together with the grading of that examination within five (5) business days after said examination. The candidate may see the above material, but may not remove the examination from the personnel office.

11. Candidates arriving after the appointed starting time of the examination will not be admitted or allowed to participate in the examination.

12. All questions formulated by the outside consultant (and their correct answers) shall be derived from the materials selected by the Chief as study materials in accordance with Subparagraph 3, above.

13. Matters relative to construction of any promotional written test which are appealable to the Civil Service Commission, pursuant to Chapter 143, Local Government Code, V.A.T.S., shall continue to be appealable and the decision of the Commission shall be final.

D. **Examinations for promotion to Detective Investigator and Sergeant:** In addition to meeting the requirements set forth in subparagraphs C 1 through 13, above, promotional examinations for promotion to Detective Investigator and Sergeant shall also comply with the following:

1. Written examinations for promotion to Detective Investigator and Sergeant shall consist of one exam session which shall not exceed either 100 multiple choice questions or two hours in length.

E. **The Examinations for promotion to the ranks of Lieutenant and Captain:** In addition to meeting the requirements set forth in subparagraphs C 1 through 13, above, promotional examinations for promotion to Lieutenant and Captain shall also comply with the following:

1. The assessment center process formerly provided in the collective bargaining agreement is eliminated and abolished as of the date of the entry of this Decree.

2. Written examinations for promotion to Lieutenant and Captain will consist of an examination session in the morning which shall not exceed either 100 multiple choice questions or two (2) hours in length and an afternoon session on the same day with questions which may be based upon video and/or written scenarios as determined by the outside consultant in consultation with the city. The answers to the questions of the afternoon session shall also be multiple choice. The afternoon portion of the examination will not have a limit as to the number of questions, but shall have a time limit of two hours. All video presentations, written scenarios, and questions derived therefrom shall be validated as job related. The afternoon session of the written exam shall not be weighted more than thirty percent (30%) of the overall written exam score.

F. The following provisions will apply to promotions to Detective Investigator, Sergeant, Lieutenant, and Captain. Subject to the terms and limitations set forth below, points will be added to an officer's score on the promotional examinations as follows:

1. Each police officer shall be given one point for each year as a classified police officer in the San Antonio Police Department, up to a maximum of ten points, in compliance with Article XI, Section 1(A) of the collective bargaining agreement and as further described and limited therein;

2. Seniority for time in rank shall be calculated and determined in accordance with Article XI, Section 1(C) of the Collective Bargaining Agreement. Each candidate for promotion shall receive one (1) point for each year (as determined under the Collective Bargaining Agreement) in the rank from which the candidate seeks promotion up to and not more than five (5) points.

3. **Educational Credit.** Subject to the conditions and limitations set forth below, candidates for promotion will be

entitled to receive extra points for educational achievement, depending on the rank to which they seek promotion, as follows:

a.) Candidates for promotion to Detective Investigator or Sergeant will be entitled to receive a maximum of one point for a Bachelor's degree (B.A. or B.S.), regardless of the number of bachelor's degrees.

b.) Candidates for promotion to Lieutenant or Captain will be entitled to receive up to a maximum of two (2) points, as follows:

I.) A maximum of one point for a Bachelor's degree (B.A. or B.S.), regardless of the number of Bachelor's degrees; and

ii.) one point for a Masters Degree, regardless of the number of Master's degrees.

c.) In order to qualify for point credits pursuant to subparagraphs a and b, above, all degrees must be from fully accredited institutions of higher learning which must be approved by the Chief, in his discretion, in consultation with the city's Department of Human Resources. No credit will be granted for degrees obtained from correspondence schools.

d.) As a further condition for qualifying for point credit, the degrees obtained must be in majors or fields determined by the Chief, in her/his discretion, to be related to the mission and operations of the SAPD. As a guide to officers, the Chief will designate in writing the majors which will presumptively qualify for points within ninety days of the entry of this decree. The Chief, however, may thereafter add to the list of degree majors initially designated by giving notice of such additions in written form. Changes in this listing may be made by the Chief from time to time as circumstances and departmental needs change. However, with respect to a particular promotion cycle, the additions of college majors to the list shall be announced no later than the date the examination is announced. The attorneys for Plaintiffs and SAPOA (or the individual designated by said attorneys) shall be notified of any proposed changes prior to implementation of such changes.

e.) Notwithstanding any language in Subparagraph 3 a through e of this Article VII or anywhere else in this Decree, there shall be no credit given for any degree until after eighteen (18) months from the date of the entry of this Decree. Implementation of this section shall be undertaken in a manner which does not invalidate any promotion list in effect when this section is implemented. Accordingly, nothing herein shall impair, modify or affect any eligibility list which is unexpired on the date of the implementation of this provision and/or any officer's rank on any such unexpired list, and any such unexpired list will continue to be utilized until its expiration.

4. *Language Proficiency Points.*

A. Beginning eighteen (18) months after the entry of this Decree, candidates shall be entitled to receive one (1) point for possessing proficiency in language skills in accordance with the provisions of this subparagraph, provided, however, that nothing herein shall impair, modify or affect any eligibility list which is unexpired on the date of the implementation of this provision and/or any officer's rank on any such unexpired list, and any such unexpired list will continue to be utilized until its expiration.

B. No officer will be entitled to more than one point under this provision, regardless of the number of languages in which s/he is proficient. "Proficiency in language skills", as used herein, shall be defined as the ability to communicate effectively in a language other than English (*e.g.*, sign language, Spanish, Russian, Portuguese, German, etc.) provided, however, that such proficiency has been verified as follows:

a.) certification by an institution or process meeting the requirements and standards set by the city of San Antonio's Department of Human Resources. (By way of example, a proficiency assessment program such as the current

UNAM program or, in the case of other languages, a comparable proficiency certification); and

b.) one of the two requirements set forth below:

I) the successful completion of six (6) hours of credit at the college level in the same language as (a), above; or

ii) the passing of an exam administered through the auspices of a college which is accredited and approved in the same manner as set forth in Sub-paragraph F3(C), above, which exam verifies that the examinee has a proficiency in a language which is the equivalent of six (6) hours of college credit in the same language as (a), above.

5. Upon being sustained through final disposition, disciplinary actions resulting in suspensions of thirty (30) days or more shall result in the deduction of one (1) point for each such disciplinary action. Discipline will be given effect for the same periods of time as set forth in Art. XXVII, Section 19 a through d of the Collective Bargaining Agreement. If discipline becomes final while an officer is on the promotional list awaiting promotion, her/his ranking shall be adjusted to take into account the disciplinary point deduction. For officers who are on promotional probation at the time that they are disciplined, the probationary period will be extended for as long as an appeal of discipline is pending.

G. Notwithstanding any language in this Article VII or the omission of any language, the Parties shall retain whatever rights and prerogatives they now possess under the Collective Bargaining Agreement, the bargaining relationship between the City of San Antonio and Intervenor, and/or state law (including but not limited to, Chapter 143, Local Government Code) unless such rights or prerogatives are in conflict with the specific and express terms of this Consent Decree.

H. The provisions of this Article VII of this Consent Decree shall be effective upon entry by the Court except for subpara-

graphs F(3) and F(4) which do not become effective for eighteen (18) months after the date of the entry of the Consent Decree by the Court.

I. Article XI, Sections 2A, 3, 4, and 5 of the collective bargaining agreement shall be replaced by this Article VII of this Consent Decree.

## VIII.

## DISSEMINATION OF EMPLOYMENT OPPORTUNITIES

The parties agree that individuals' promotional mobility may be enhanced by a broader dissemination of available vacancies for sworn positions within the SAPD in certain areas of the SAPD. To promote that end, the SAPD will disseminate available or anticipated vacancies for sworn positions within the SAPD as follows:

A. New positions to be created by the budget shall be posted in the Daily Bulletin within one (1) month after the budget is approved by City Council. As the availability or number of these positions changes (e.g., filling of vacancies, modification of job requirements, elimination of positions, and/or increase in number of positions), such changes will be publicized in the Daily Bulletin for three (3) consecutive business days.

B. Positions created during the fiscal year will be publicized for three consecutive business days in the Daily Bulletin.

C. The name(s) of the individuals selected to fill the positions by promotion or transfer shall be publicized in the Daily Bulletin for three (3) consecutive business days after they are filled.

## IX.

## APPLICANT PROCESSING

A. The written entrance examination for new applicants shall be validated as being job related. This shall be accomplished by retaining an individual or firm, qualified and agreed to by the parties to evaluate such testing.

B. The Interview Board for prospective uniformed employees shall be eliminated as it exists.

C. In place of the current Interview Board, the Chief shall establish a pool of SAPD officers generally reflective of the diversity of the department who have received a minimum of four (4) hours of training in the area of personnel selection and interviewing techniques. Barring unusual circumstances, the composition of the pool shall remain constant for a period of one year. From such pool, the Chief shall select from three (3) to five (5) individuals for each panel to conduct interviews of candidates for employment in the uniformed service and to determine the candidate's suitability.

D. Nothing in this Article shall be construed or given the effect of limiting or otherwise preventing the SAPD from maintaining, developing and/or implementing any selection processes or other tests to be used in addition to the written exam and interviews referenced above, so long as such selection processes or tests are not in conflict with Title VII or any Article of this Decree.

## X.

### INFORMATION TO CANDIDATES

A. Interview notes of the interview board will be maintained in accordance with SAPD's record retention schedule or the date of the expiration of this Decree, whichever time period is longer.

B. A generalized statement of the reasons a candidate is not selected shall be reduced to writing and if s/he so requests, provided to the candidate within a reasonable amount of time after the candidate's request.

C. The Department shall maintain each candidate's application file in its custody for a period of not less than one (1) year. A candidate's own file may be released to the candidate or to interested parties with the written consent of the applicant/candidate, provided, however, that SAPD shall have the right to withhold any information in said file(s) where: 1) the information is confiden-

tial, 2) the disclosure of the information would contravene any applicable law or regulation, 3) disclosure could adversely affect any criminal investigation or similar law enforcement interest, or 4) the information was provided to the SAPD under circumstances reflecting an expectation or promise that the information would be kept confidential.

D. Statistical data regarding whether or not an applicant is Hispanic, test scores, and a generalized statement of the reasons for non-hiring shall be maintained by the Department and made available to the Plaintiffs or their representatives for purposes of assuring compliance with the terms of this Decree. The foregoing information shall be supplied without the names of the candidates/applicants.

E. SAPD will develop a mentoring program to mentor applicants through the period between their selection for the police academy until the end of their probationary period. This plan will be prepared and presented to Plaintiffs and SAPOA within 180 days of the entry of this Decree.

F. SAPD will develop a recruiting plan and submit it to Plaintiffs and SAPOA within 180 days of the entry of this Decree. Thereafter during the term of this Decree, SAPD will submit any revisions, new plans, or modifications to the Recruiting Plan to Plaintiffs and SAPOA within sixty (60) days of the start of the city's fiscal year.

## XI.

### RECRUITMENT

A. **Background:** As stated in its mission statement, The San Antonio Police Department considers it to be an important objective for the Department to be reflective of and sensitive to the cultural and ethnic diversity of the community to the extent that this may be achievable under current law, within budgetary constraints, and with full regard to the constitutional, statutory and contractual rights of current employees and applicants. To achieve this objective while maintaining the highest of standards, the SAPD will endeavor to recruit the best qualified individuals through the Recruiting and Applicant Processing Units.

B. **Program:** The Department will continue its efforts to increase the number of qualified applicants regardless of national origin, race, national origin, gender, religion, or other illegal factors. These efforts will include recruitment aimed at minority communities. Implementing the following measures will help achieve the objective:

1. The Recruiting Unit and the Applicant Processing staff will have sufficient personnel, as determined by the Chief, to correspond with their levels of activity, giving consideration to the budgetary limits of the Department.

2. The Department will have the goal of recruiting applicants who possess backgrounds which are reflective of community and customer service and other characteristics necessary for becoming a police officer of the highest caliber and who manifest backgrounds reflective of the Department's community oriented policing philosophy.

3. The Department will ask for volunteers from among the existing officers at each police substation to provide liaison services, along with their regular duties, at no extra pay. This liaison officer will coordinate with the Recruiting Unit and act as the substation's recruiting officer at no extra pay. Duties of these officers will include assisting and meeting with individuals, groups, schools and other organizations within the service area to attract and monitor qualified individuals.

C. **Overriding Principles:** In accordance with the SAPD's existing policies, all applicants will be treated without any preference being given to race, gender, Hispanic national origin, or religion. The SAPD's existing policy of treating all applicants in compliance with the ADEA and the ADA will also continue.

D. The City of San Antonio, will provide the following information to the parties, upon tabulation, after each entrance examination administered during the term of this Decree:

1. Number of applicants who took exam

2. Number of applicants who were admitted to the training academy

E. The City of San Antonio, will also provide to Plaintiffs and SAPOA the following: notice of the recruiting drives conducted, if any, including dates of such drives, location where such drives were conducted, and identification of San Antonio Police Department personnel conducting such drives. The Recruiting Unit shall maintain the foregoing information.

F. Equipment or hardware shall be made available to the Recruitment Unit, subject to the approval of the Chief, for purposes of conducting its recruitment within the limitations of the budget as set by the Chief. Such equipment may be obtained from the Asset Seizure Unit and/or from any other appropriate source.

G. **Interpretation and Application:** All of the provisions in this Article XI are intended only as statements of generalized ideals rather than mandates or specific requirements. Therefore, the San Antonio Police Department shall have the right to make changes, exceptions, deletions, improvements and other modifications in the goals, budgets, number of personnel referenced for particular roles, procedures, programs, and efforts referenced above. Notwithstanding any language or provision in the foregoing Paragraphs Nos. 1 through 4, above, ·nothing herein shall be construed as or given the effect of either allowing or requiring race, national origin, or gender to be utilized to any degree as a factor in recruiting, selection or hiring of any individual, except, and only if, same may be expressly allowed by law.

## XII.

### PREVENTION OF ANY HOSTILE WORKING ENVIRONMENT

No later than ninety calendar days from the date of the entry of this Decree, the SAPD, through the Chief of Police shall prepare standards under which the employees of the Department are to comport themselves regarding issues dealing with race, ethnicity, cultural differences, national origin, religion, age, and gender. These standards shall articulate standards and disciplinary measures

for their violation. Such standards shall address but not be limited to such practices as joking, commenting, or circulating written or graphic materials which ridicule, belittle or embarrass any employee on the basis of race, ethnicity, national origin, cultural differences, religion, age or gender. The Chief shall be responsible for developing, articulating and disseminating the Department's standards in such a manner as will inform all employees of the proscribed conduct and the applicable disciplinary measures.

## XIII.

### UNDERCOVER ASSIGNMENTS

The parties agree and acknowledge that the staffing requirements for undercover assignments fluctuate depending on caseload, availability of personnel, and other factors, many of which are not predictable. To the extent that there are sufficient numbers (as determined by SAPD in its sole and exclusive discretion) of qualified, capable, and suitable volunteers for undercover assignments, SAPD will endeavor to continue its practice of making such assignments on a voluntary basis. However, SAPD may make these assignments on a non-voluntary basis when deemed necessary by SAPD in the interests of public safety, law enforcement needs, organizational requirements, and personnel needs. Where undercover assignments are made on a non-voluntary basis, they will be based on "legitimate, nondiscriminatory reasons", as those terms are defined by Title VII. The failure to volunteer for undercover duty will give rise to no reprisal or retaliation against any officer.

## XIV.

### SAPD DIRECTIVES

Official orders and directives, memos and other notices directing instructions to individuals or groups issued by the SAPD with respect to policies and operating procedures shall identify the actual individual issuing same.

## XV.

### TRAINING

SAPD will publicize in the Daily Bulletin announcements regarding training which is available and approved by the Department. Plaintiffs, as well SAPOA, may also supplement the information available by requesting permission from the Chief to include other law enforcement related training opportunities in the Daily Bulletin. The permission of the Chief for such inclusion will not be unreasonably denied. Specialized training and educational opportunities in law enforcement, when available, will be granted without regard to the consideration of any factors prohibited by Title VII. No officer may travel for training more than twice per fiscal year without affording other officers of the same rank, similar training and travel, except with the approval of the Chief in writing, setting forth the Departmental rationale approving same.

## XVI.

### EQUAL EMPLOYMENT OPPORTUNITY

The SAPD hereby acknowledges and reaffirms its responsibility for providing recruitment, promotions, transfers, and work assignments based on valid departmental needs, qualifications, or other legitimate, nondiscriminatory criteria without regard to factors prohibited by Title VII.

## XVII.

### TERM

This Consent Decree shall remain in force and effect until September 30, 2002, on which date it shall expire by its own terms on that date without any action by any of the Parties or the Court. However, without limiting any other reasons allowed by law or equity for a motion to modify or terminate, any party hereto shall have the right at any time to move for its termination and/or modification before the expiration date on the grounds that the purposes of this Consent Decree have been achieved and/or other grounds available at law or equity.

The following articles of this Consent Decree shall be regarded as additional provisions of the collective bargaining agreement between Intervenor and the City of San Antonio which shall be incorporated into said collective bargaining agreement:

1. Dissemination of Employment Opportunities, Art. VIII

2. Undercover Assignments, Art. XIII

3. SAPD Directives, Art. XIV

4. Training, Art. XV

5. Discipline, Art. XIX

6. Overtime, Art. XX

7. Job Descriptions, Art. XXIV

8. Personnel Management Training, Art. XXV

The aforementioned articles of the consent decree shall therefore remain in force and effect (as part of the collective bargaining agreement) for the term of the existing collective bargaining agreement or any extension of such collective bargaining agreement's term by the mutual agreement of the city and the SAPOA, Intervenor.

## XVIII.

### ALTERNATIVE DISPUTE RESOLUTION AND ENFORCEMENT

A. Should any class member or Party hereto have any dispute arising over the interpretation or application of this Consent Decree, such dispute shall be resolved pursuant to the final and binding grievance procedures set forth under Article XV of the Collective Bargaining Agreement between the city and the SAPOA. In any arbitration alleging breach of the terms of this Consent Decree or regarding its interpretation or application, the judicial interpretations and principles under Title VII shall be applied by the arbitrator. Should any party to the arbitration wish to challenge an arbitrator's decision hereunder, he may seek to vacate such arbitration decision in a Court of competent jurisdiction. The grounds for vacating such arbitration award shall be limited to the following:

1. That the award failed to apply or misapplied principles and precedent under Title VII;

2. That the award itself is in violation of the terms of this Consent Decree;

3. The arbitrator's misconduct or pre-existing bias against the losing party which resulted in a fundamentally unfair award;

4. Fraud involving the arbitrator which results in a fundamentally unfair award; and/or

5. That the award is against public policy.

B. The party which prevails in any judicial proceeding to vacate the award will be entitled to its reasonable attorneys' fees and costs incurred in the proceeding to vacate the award only if:

1. the Court, in its sound discretion, determines that such fees, costs, and expenses should be awarded; and

2. the Court finds that the breach of the Consent Decree was by the city's policy makers; and

3. the Court also finds that such breach was egregious *and* in reckless disregard of the provisions of the Consent Decree.

C. Notwithstanding the foregoing, and under circumstances demonstrated to be both exigent and in compliance with all of the requirements of the Federal Rules of Civil Procedure governing temporary restraining orders and injunctions, any party may petition for emergency equitable relief.

## XIX.

### DISCIPLINE

A. Disciplinary procedures and the activities of the Professional Standards Section will be conducted in a manner which does not unlawfully discriminate against any person in violation of Title VII.

B. A civilian review board has been established and will continue to function under the terms and conditions set forth by the city and SAPOA for the duration of this Consent Decree.

C. The SAPD has begun and will continue its existing practice of appointing a person of the rank of Captain or higher to serve as Professional Standards Commander.

D. **Internal Investigations:** After the facts have been accumulated, the officer being investigated will be provided with information as to which Departmental Rule(s) or Regulation(s) are alleged to have been violated. If during the course of an investigation, the investigation is to be expanded beyond the original scope, the subject officer shall receive information in writing as to which additional rules or regulations are alleged to have been violated from the Professional Standards Commander after the facts have been gathered.

E. **The administrative Professional Standards Advisory Action Board hearings:** The officer being investigated shall have the right to bring a sworn member of the SAPD and/or his/her supervisor to her/his hearing, provided, however, that said supervisor or sworn member brought to the hearing shall not participate in the hearing except to counsel the employee.

## XX.

### OVERTIME

The SAPD will review and assess its existing practice with respect to overtime assignments to ensure that such assignments are made based on legitimate, nondiscriminatory criteria and that no officer is limited or excluded from such assignments based on factors prohibited by Title VII. Within forty-five days of the end of each calendar year, the Chief will make available the overtime earnings of each officer to counsel for Plaintiffs and the designated representative of SAPOA both of whom shall maintain the confidentiality of such information, provided, however, that use of this information in proceedings to enforce any provision of this Consent Decree shall not be construed as a violation of this confidentiality provision. Nothing herein shall be construed as limiting or expanding any rights which any person may otherwise have under the Texas Public Information Act (Open Records Act).

## XXI.

### NEPOTISM

The SAPD shall within one (1) year of the signing of this Decree conduct an appraisal of the Department to ensure compliance with the City Code and Personnel Regulations of the City of San Antonio regarding nepotism. All SAPD sworn personnel shall be required to execute a statement by January 31st of each year identifying all known relatives whether by affinity or consanguinity of the second degree. The willful failure to execute such statement shall be considered "insubordination".

## XXII.

### GEOGRAPHIC ASSIGNMENTS

Geographic assignments shall not be based on factors prohibited by Title VII.

## XXIII.

### NON RETALIATION

It shall be a violation of this Consent Decree for the SAPD to discriminate or retaliate against any officer because she/he has opposed any practice made unlawful by Title VII and the terms of this Consent Decree, or because she/he has made a charge, testified, assisted, or participated in any manner in this lawsuit.

## XXIV.

### JOB DESCRIPTIONS

The SAPD shall maintain classifications for all uniformed personnel, which shall also describe tasks and responsibilities.

## XXV.

### PERSONNEL MANAGEMENT TRAINING

The SAPD shall continue its mandatory training in the area of supervisory/management training. Such course shall be mandatory for Sergeants, Lieutenants, and Captains.

## XXVI.

### SEVERABILITY CLAUSE

The terms and conditions in this Consent Decree shall be construed as being severable. Should any part, phrase, covenant, term, language, provision, or clause of this Consent Decree be declared void, unenforceable, illegal, or without legal effect, each and every other provision, phrase, covenant, clause, and term herein shall remain in full force and effect.

## XXVII.

Defendants shall pay Plaintiffs attorneys fees, costs, and expenses in such amount and in such manner which has been mutually agreed upon between Defendants and SAH-POO, in the sole discretion of SAHPOO and Defendants, and Plaintiffs hereby agree to be bound by the terms, conditions and limitations in said agreement regarding attorneys fees. Intervenor shall not be required to pay any attorneys fees, costs, expenses, or other amounts to either Plaintiffs or Defendants nor shall Plaintiffs or Defendants be required to pay any attorneys fees, costs, expenses, or other amounts to Intervenor.